STATE OF NORTH CAROLINA v. RICHARD ALLEN STOKES

No. COA00-1526

(Filed 21 May 2002)

**1. Confessions and Incriminating Statements— motion to suppress—Sixth Amendment right to counsel**

The trial court did not violate defendant's Sixth Amendment right to counsel in a first-degree felony murder and felonious child abuse case by denying defendant's motion to suppress a purported confession made by defendant to an officer who was walking by the cell block where defendant was being held and who initiated the conversation with defendant even though a first-degree murder warrant had been secured and served on defendant, and defendant had been arrested and had appeared before a magistrate, because: (1) an arrest warrant for first-degree murder in North Carolina is not a formal charge such that the Sixth Amendment right to counsel is invoked; (2) a defendant's Sixth Amendment right to counsel does not attach either at the issuance of the warrant or at the time of his arrest upon the warrant; and (3) a defendant's appearance before a magistrate does not trigger his Sixth Amendment right to counsel since no adversary judicial proceedings have commenced at that point.

**2. Confessions and Incriminating Statements— motion to suppress—Fifth Amendment right to be free from self-incrimination**

The trial court violated defendant's Fifth Amendment right to be free from self-incrimination in a first-degree felony murder and felonious child abuse case by denying defendant's motion to suppress a purported confession made by defendant to an officer who was walking by the cell block where defendant was being held and who initiated the conversation with defendant, and defendant is entitled to a new trial because: (1) defendant was in custody at the time the statement to the officer was made; (2) defendant was being interrogated by the officer since the officer's question of "how?" is the type of question that necessarily invites a response, and the officer's question was designed for the purpose of eliciting a response he knew or should have known was reasonably likely to be incriminating; (3) defendant's meeting with his counsel, as well as his arrest and the passage of nineteen hours, diluted the first and only Miranda warning given to defend-

**STATE v. STOKES**

[150 N.C. App. 211 (2002)]

ant; and (4) the State failed to meet its burden to show admission of defendant's statement to the officer was harmless beyond a reasonable doubt.

### 3. Criminal Law— jury instruction—defendant's hands as a deadly weapon

The trial court did not abuse its discretion in a first-degree felony murder and felonious child abuse case by its jury instruction on the use of defendant's hands as a deadly weapon, because the trial court made it clear to the jury that the jury was not compelled to infer anything and that it was free to decide from all the evidence whether defendant's hands had been used as a deadly weapon.

### 4. Evidence— minor child's prior injuries—opinion testimony about battered child syndrome

The trial court did not err in a first-degree felony murder and felonious child abuse case by permitting the State to offer evidence of the minor child's prior injuries to his ear and head, as well as the opinion testimony of a doctor that the minor child suffered from battered child syndrome, because: (1) evidence of the prior injuries was relevant to the doctor's diagnosis of battered child syndrome; and (2) the basis of the doctor's expert opinion was his experience and education, as well as his review of the minor child's medical records and the autopsy report.

Judge HUNTER concurring in part and dissenting in part.

Appeal by defendant from judgment dated 29 February 2000 by Judge Michael E. Beale in Superior Court, Davidson County. Heard in the Court of Appeals 29 November 2001. An opinion in this case was originally filed 16 April 2002. The opinion was withdrawn by order entered 26 April 2002. This opinion replaces the prior opinion of this Court.

*Attorney General Roy Cooper, by Robert J. Blum, Special Deputy Attorney General, for the State.*

*Danny T. Ferguson, for defendant-appellant.*

McGEE, Judge.

Richard Allen Stokes (defendant) was indicted on 11 May 1998 for first degree murder of two-year-old Alexander Ray Asbury (Alex) and on 8 June 1998 for felonious child abuse of Alex. Both crimes

STATE v. STOKES

[150 N.C. App. 211 (2002)]

were alleged to have been committed on 1 April 1998 and were consolidated for trial.

Evidence at trial for the State tended to show that Alex died in the early morning hours of 1 April 1998. Alex lived in a mobile home with his mother, Tricia Burnette, formerly Tricia Asbury (Tricia), and defendant. Defendant was Tricia's boyfriend and had lived with Tricia and Alex since August of 1997. Defendant was not Alex's biological father.

Tricia put Alex to bed at approximately 9:30 p.m. on 31 March 1998. Tricia went to bed at 10:00 p.m. and defendant followed shortly thereafter. Before going to bed, defendant smoked marijuana, as he did most nights. Tricia testified she was awakened shortly before 4:00 a.m. by defendant screaming that Alex was not breathing. Tricia called 911 and she and defendant administered CPR to Alex. Flynt Hill, an EMT/Paramedic who responded to Tricia's call, found that Alex was not breathing and had no pulse or heart activity. Alex was transported to Wake Forest University Medical Center (Baptist Hospital) in Winston-Salem by ambulance. Defendant and Tricia followed the ambulance to the hospital where Alex was pronounced dead at 4:52 a.m.

The day before his death, Alex attended Sunshine Day Care. Crystal Wilkes, the owner and director of the day care, and Angela Reece, a teacher there, testified that they noticed nothing unusual about the way Alex was acting at day care on 31 March 1998. Tricia testified she picked Alex up from day care shortly after 5:00 p.m. on 31 March 1998 and took him to get his hair cut. She did not notice anything unusual about Alex after she picked him up from day care. Gerri Brown cut Alex's hair and testified that she did not notice anything out of the ordinary about Alex that evening.

Tricia and Alex then visited defendant for about an hour at defendant's place of employment, playing football in the parking lot. Tricia and Alex next visited Tricia's mother, Donna Burnette (Mrs. Burnette). Mrs. Burnette testified that Alex was very excited because he had just gotten his hair cut and was acting "very energetic." Mrs. Burnette stated that she saw Alex four to five times a week and on that evening did not notice anything unusual about his head. Tricia went to the basement of her mother's home to use a tanning bed for about twenty minutes while her mother watched Alex.

Mrs. Burnette testified that while Tricia was downstairs, Alex ran into a buffet, hit the left side of his head, fell down and began to cry. Shortly thereafter, Alex again ran into the buffet and hit the right side of his head, but did not fall down. She stated that "[t]he skin [on Alex's head] wasn't broken, it was red, but it wasn't bruised." Mrs. Burnette said she did not feel Alex needed emergency medical treatment at that time. Mrs. Burnette said to Tricia that "Alex broke his record, he had fallen twice in less than 20 minutes."

Tricia and Alex then picked up a pizza, which they and defendant ate for dinner. Tricia washed Alex and put him to bed. Tricia testified that she did not see any bruising on Alex.

The State presented evidence at trial of prior injuries Alex had sustained. Tricia testified that on or about the morning of 9 February 1998, she saw purple and black bruising on Alex's right ear. She testified that Alex's ears were not bruised before he went to bed the previous night. She said that she and defendant decided it was caused by Alex's bed. Tricia called Dr. Nifong, Alex's pediatrician, that afternoon about Alex's ear and he told her to bring Alex in if the ear was swelling. Crystal Wilkes testified that around 9 February 1998 she noticed that Alex's ear was covered with bruises and was swollen. She discussed the injury with Tricia who told her that Alex had gotten his head caught in the railing of the bed. Mrs. Burnette also testified that on or about the morning of 9 February 1998, Tricia called and told her that Alex had gotten his ear "hung in the slats of his bunk bed."

Tricia also testified at trial that she noticed a soft spot on Alex's head when she was bathing him on 22 February 1998 and sought medical treatment from Dr. Nifong. Dr. Nifong examined Alex and referred Tricia to Dr. Bell, a neurosurgeon. Alex was seen by Dr. Bell twice. Dr. Bell took a CT scan of Alex's head and told Tricia to continue to observe the soft spot on his head. Crystal Wilkes testified that she, too, noticed a soft spot on the back of Alex's head around 22 February 1998 and discussed this with Tricia. Tricia told Crystal Wilkes that she was concerned about the soft spot and was having Alex treated by a doctor.

Tricia testified that Alex suffered from asthma which frequently caused him to have breathing problems. Alex took medicine through a nebulizer if he had a cold or an asthma attack. She testified that Alex was often treated by Dr. Nifong for asthma problems.

Dr. Patrick Lantz (Dr. Lantz), a forensic pathologist at Baptist Hospital, testified that he performed an autopsy on Alex on 1 April 1998. Upon an external exam, Dr. Lantz saw signs of injury and testified that Alex

> had a small bruise between his right eyebrow and the hairline, which was about a quarter of an inch in size, then he had a smaller one than that, a small little bruise right at the corner of his eyebrow on the right side. He also had a small little bruise on the left side. Looking through the hair, I could actually see that there was some bruising of the scalp on the right and the left side in the hair, farther back on the forehead, both on the right and the left side.

Dr. Lantz also noted three bruises on Alex's back, as well as bruises on Alex's legs typical of those found on a young child. Dr. Lantz concluded that Alex's death was not caused by abnormalities in Alex's cardiovascular system or respiratory system, nor did he find abnormalities in Alex's liver, gallbladder, pancreas or the first part of his small bowel. He did note that "there was a little bit of fat in the liver cells" but nothing in Alex's records suggested that this caused Alex's death or that Alex suffered from Reyes Syndrome. Dr. Lantz concluded that Alex's death was caused by "cerebral edema or swelling of the brain due to an acute intracranial injury from blunt force trauma of the head."

When asked if the injuries he discovered were consistent with the type of injuries Alex could have received from hitting his head on the buffet, Dr. Lantz stated that

> [b]ased on the pattern of the injuries on the left side and the severity with the amount of hemorrhage under the parallel bruises, I would say it would be inconsistent with any two year or two-and-a-half-year-old running into that and being knocked down just by the force of, you know, falling into it. . . .
>
> The smaller bruise between the eyebrow and the hairline may have been caused by some type of minor bump like that, but the larger two by two inch bruise back in the hairline sort of had a repeating nodular pattern with a hemorrhage underneath it, which was over four inches in size, would not be consistent within any reasonable medical probability of that type of injury.

Upon questioning by the State, Dr. Lantz agreed that Alex's head injury could "be consistent with a mature adult taking his right hand, folding it . . . and striking th[e] child."

Dr. Lantz was tendered as an expert on battered child syndrome based on his education, training, and experience. Dr. Lantz testified that he had performed about 2,000 autopsies over his career and had, in other cases, been qualified as an expert on battered child syndrome. He described battered child syndrome as "repeated nonaccidental injuries to an infant or a child either at one setting or over a period of time." After reviewing the records discussing the soft spot on Alex's head that Tricia noticed on 22 February 1998, Dr. Lantz testified that "[b]ased on the location and the hemorrhage [on the head], it would be highly unlikely to be due to an accidental injury." Dr. Lantz concluded that this type of injury "usually [would] be attributed to some type of direct trauma or [if] someone grabs a child's hair and pulls on it very sharply." Additionally, after reviewing the records reporting the bruise on Alex's ear that Tricia noticed around 9 February 1998, Dr. Lantz testified that "[a] bruise or an injury to an ear on a child, that's not a typical occasion or an accidental injury in a child from [a] usual day-to-day running around, falling and playing. That type of injury is more likely than not to be non-accidental." Dr. Lantz testified that after reviewing Alex's records kept by Dr. Nifong, Dr. Bell, Dr. Orr, the radiologist who performed Alex's CT scan, Dr. Griffith, Alex's primary care provider, the records from Baptist Hospital, the ambulance call report, and the autopsy report, it was his opinion that Alex "did suffer from Battered Child Syndrome."

Defendant presented evidence at trial, including the testimony of Dr. Edward Robert Friedlander (Dr. Friedlander), chairman of the pathology department at the University of Health Sciences in Kansas City, Missouri and teacher at the University of Missouri School of Medicine. Dr. Friedlander was tendered as an expert in clinical and anatomical pathology and it was his opinion that Alex's head injury could have been caused by something other than a fist. He stated that the injury could have been caused by running into the buffet. According to Dr. Friedlander, the fat cells found in Alex's liver, as noted by Dr. Lantz in his autopsy report, although "not fully developed Reyes," could be Reyes related and "one of the Reyes mimics." Dr. Friedlander agreed that Alex's "death was caused by the cerebral edema following the head trauma [but was] concerned that there was something else going on that would be more viable to the effects of a household accident." He stated that "one punch to a two-year-old's

head . . . can cause cerebral edema." When questioned about battered child syndrome, Dr. Friedlander stated that was "not something that [he] would want to say that's present or not present."

Defendant testified at trial that he loved Alex, he never disciplined him, and that Tricia took the responsibility of caring for Alex. He said he noticed the bruise on Alex's ear in early February 1998 and looked at it with Tricia. The evening of 31 March 1998 he helped Tricia put Alex to bed and did not notice anything unusual about Alex at that time. He admitted that he smoked marijuana that night and "[e]very night if I had it," but did not drink alcohol or smoke cigarettes and never smoked marijuana around Alex. He testified that he often got up two to three times a night and on 31 March 1998, he awoke around 12:00 a.m. or 12:30 a.m. and went to the bathroom. Before returning to bed, he checked on Alex "[l]ike [he] always d[id]," and stated that Alex was breathing regularly. At approximately 3:55 a.m., defendant again awoke and went to the bathroom. He again checked on Alex and noticed that Alex's fingertips were blue. Defendant stated that he then "stuck [his] finger in [Alex's] mouth to see if there was any kind of objects in his mouth or down his . . . throat," but there was nothing there so he "picked him up immediately and ran." He called for Tricia to call 911 as he ran through the kitchen and then defendant began performing CPR on Alex. Defendant testified that he thought Alex was not breathing because of his asthma. Defendant testified that he never hit, squeezed or pinched Alex, or laid a hand on him, nor did he ever physically discipline him.

A jury found defendant guilty of first degree felony murder and felonious child abuse. The jury recommended that defendant be sentenced to life imprisonment without parole. Defendant appeals.

I.

Defendant argues that the trial court erred in denying his motion to suppress a purported confession made to Officer Varner, thus depriving defendant of his state and federal constitutional rights to representation by counsel and right to be free from self-incrimination.

Prior to trial, defendant moved to suppress statements he made to law enforcement on 1 April 1998 and 2 April 1998. At issue on appeal is the statement defendant made to Officer Varner on 2 April 1998. When a defendant objects to the admissibility of certain evidence at trial, "the trial court must conduct a *voir dire* hearing to determine [the] admissibility" of that evidence. *State v. Porter*, 303

N.C. 680, 691, 281 S.E.2d 377, 385 (1981). "The trial court's findings of fact following a *voir dire* hearing are binding on this [C]ourt when supported by competent evidence." *State v. Lane*, 334 N.C. 148, 154, 431 S.E.2d 7, 10 (1993). However, "the trial court's conclusions of law based upon those findings are fully reviewable on appeal." *Id.*

In the case before us, a *voir dire* hearing was held to determine the admissibility of defendant's statement to Officer Varner as well as statements made to other law enforcement officers. Evidence at the hearing relevant to this issue tended to show that Officer McDade testified that on 1 April 1998, defendant voluntarily went with him to the Davidson County Sheriff's Department, where he read defendant his *Miranda* rights at 4:57 p.m. Defendant was not under arrest at that time. Defendant acknowledged that he understood his rights and that he was "willing to talk to [Officer McDade] now and willing to talk to [Officer McDade] without a lawyer." Defendant remained at the Sheriff's Department for about five hours and during that time he made several statements to various law enforcement officials. Defendant first made a written, signed statement at approximately 6:00 p.m., stating that he did not have anything to do with Alex's death but instead found Alex in his bed shortly before 4:00 a.m. with blue fingers and not breathing. Defendant made an oral statement at 8:21 p.m., which Officer McDade wrote down. The statement said that "if I did it, I didn't remember it, just give me the death penalty or I will do it in jail." At 8:30 p.m. defendant made a written, signed statement to the same effect. Defendant was then arrested on a warrant charging him with first degree murder.

Defendant made another oral statement around 9:25 p.m., which was transcribed by Officer McDade and signed by defendant at 9:57 p.m., admitting that defendant struck the child.

Larry Stokes and Angela Stokes, defendant's father and sister, testified at the suppression hearing that they hired an attorney for defendant at approximately 8:30 a.m. on 2 April 1998. Defendant met with his attorney at approximately 10:00 a.m. on 2 April 1998 for about an hour.

Officer Varner testified at the suppression hearing that around noon on 2 April 1998, he went to the jail to see who had been "charged with the killing of the child." He stated that he was not directed by any other law enforcement officer to go to the cell block. Officer Varner testified that he went to the cell block to see defendant and defendant said, "What do you want?" Officer Varner then asked

defendant, "How?" Officer Varner testified that defendant said that "[h]e just kept crying and I lost it, ain't nothing I can do but the time now." Officer Varner described defendant at the time as "[c]alm, relaxed, just sitting on the bunk." Officer Varner made no record of this exchange and thereafter left the jail. At no point did Officer Varner read defendant his *Miranda* rights. He testified that he did not know that defendant had met with counsel earlier that morning and he did not go to the jail with any investigative purpose. When asked if "How?" was a question, Officer Varner responded, "That type of response I wasn't expecting, I just answered what he said to me." Defendant did not testify at the suppression hearing.

Following the hearing, the trial court entered an order on 4 February 2000 stating in relevant part:

> That on the 2nd day of April[] 1998, Officer Varner walked to the cell block where the defendant was being held, somewhere around noon, that the defendant's relatives had hired an attorney, . . . prior to that noon hour. That this was unknown to Officer Varner at the time. That when he walked by the cell he looked in, having never seen the defendant previously, to see who had been arrested and charged with murder, at which time the defendant spontaneously said to Officer Varner, "What do you want"? To which Officer Varner responded "How?" The defendant then spontaneously to Officer Varner said in essence, he kept crying, and I lost it and there ain't nothing I can do but the time now. That he appeared to be calm at that time. Officer Varner then turned and walked away.

The trial court concluded that the statement of defendant to Officer Varner on 2 April 1998, as well as other statements made to law enforcement officials on 1 April 1998,

> were made freely, voluntarily and understandingly. That the defendant fully understood his constitutional right to remain silent and his constitutional right for counsel and all other rights. That the defendant did freely, knowingly, intelligently and voluntarily waive each of those rights and thereupon made statements to the officers of the Davidson County Sheriff's Department.

### A. Sixth Amendment

[1] Defendant contends that his statement to Officer Varner was unlawfully obtained in violation of his Sixth Amendment right to counsel.

The Sixth Amendment to the U.S. Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the assistance of counsel for his defense." U.S. Const. amend. VI. This "right to counsel attaches only at such time as adversary judicial proceedings have been instituted 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *State v. Franklin*, 308 N.C. 682, 688, 304 S.E.2d 579, 583 (1983), *overruled on other grounds by State v. Parker*, 315 N.C. 222, 337 S.E.2d 487 (1985) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417 (1972)). Therefore, " 'only when the defendant finds himself confronted with the prosecutorial resources of the state arrayed against him and [is] immersed in the complexities of a formal criminal prosecution [is] the sixth amendment right to counsel [] triggered as a guarantee.' " *State v. Taylor*, 354 N.C. 28, 35, 550 S.E.2d 141, 147 (2001), *cert. denied*, —— U.S. ——, 152 L. Ed. 2d 221 (2002) (quoting *State v. McDowell*, 301 N.C. 279, 289, 271 S.E.2d 286, 293 (1980), *cert. denied*, 450 U.S. 1025, 68 L. Ed. 2d 220 (1981)).

Defendant contends his Sixth Amendment right to counsel had attached when he made the statement to Officer Varner on 2 April 1998 because a warrant charging him with murder had been secured and served on him, he had been arrested and had appeared before the magistrate, and he was thereafter incarcerated in the county jail. Our Supreme Court, however, has stated that "an arrest warrant for first-degree murder in this state is not a formal charge" such that the Sixth Amendment right to counsel is invoked. *Taylor*, 354 N.C. at 36, 550 S.E.2d at 147. Further, a defendant's Sixth Amendment right to counsel does "not attach either at the issuance of the warrant or at the time of his arrest upon the warrant." *Id. See also United States v. Gouveia*, 467 U.S. 180, 190, 81 L. Ed. 2d 146, 155 (1984). Finally, a defendant's appearance before a magistrate does not trigger his Sixth Amendment right to counsel because no adversary judicial proceedings have commenced at that point. *Franklin*, 308 N.C. at 689, 304 S.E.2d at 584 (citing *Tarpley v. Estelle*, 703 F.2d 157 (5th Cir. 1983)).

Therefore, in the case before us, defendant's Sixth Amendment right to counsel had not attached when Officer Varner initiated the conversation with defendant. Admission of the statement made by defendant to Officer Varner was not in violation of defendant's Sixth Amendment right to counsel.

## B. Fifth Amendment

[2] Defendant also contends that admitting his statement to Officer Varner violates defendant's Fifth Amendment right to be free from self-incrimination under *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 726 (1966), which provides that the Fifth Amendment requires that no evidence obtained from a defendant through custodial interrogation may be used against the defendant, unless the interrogation was preceded by the appropriate warnings of defendant's right to remain silent and to have an attorney present, and a voluntary and intelligent waiver of those rights.

Defendant argues that his Fifth Amendment right applies in this case because he was in custody when he made a statement to Officer Varner, and he was subjected to interrogation by Officer Varner without first being advised of his *Miranda* rights.

The State argues that Officer Varner did not interrogate defendant; rather, defendant's statement was spontaneous and therefore admissible even if Officer Varner did not read defendant his *Miranda* rights. According to the State, Officer Varner was not at the jail for the purpose of conducting an interrogation. Further, the State claims that no interrogation occurred.

The Fifth Amendment to the U.S. Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The North Carolina Supreme Court has also ruled that the Fifth Amendment provides that "no evidence obtained from a defendant through *custodial interrogation* may be used against that defendant at trial, unless the interrogation was preceded by (1) the appropriate warnings of the rights to remain silent and to have an attorney present and (2) a voluntary and intelligent wavier of those rights." *State v. Locklear*, 138 N.C. App. 549, 551 n.2, 531 S.E.2d 853, 855 n.2, *disc. review denied*, 352 N.C. 359, 544 S.E.2d 553 (2000) (citing *Miranda*, 384 U.S. at 479, 16 L. Ed. 2d at 726).

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *State v. Clay*, 297 N.C. 555, 559, 256 S.E.2d 176, 180 (1979), *overruled on other grounds, State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1982) (quoting *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706). In this case, defendant was clearly in custody at the time the statement to Officer Varner was

made. Also, Officer Varner initiated the questioning of defendant. Officer Varner went to the jail to see who had been arrested for Alex's death and there is no evidence in the record that defendant invited Officer Varner to the jail or asked to see him. Upon Officer Varner's unexpected arrival at his cell, defendant asked, "What do you want?" Defendant did not just voluntarily blurt out a confession when Officer Varner came to his cell. Instead, Officer Varner initiated questioning of defendant when he asked defendant "How?" and defendant then responded to the officer's question.

Our inquiry then becomes whether defendant was being "interrogated" by Officer Varner at the time he made the statement. "Interrogation," as that term is used in Fifth Amendment cases, is defined as " 'any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *State v. Golphin*, 352 N.C. 364, 406, 533 S.E.2d 168, 199 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 302, 64 L. Ed. 2d 297, 308 (1980)). We find that Officer Varner interrogated defendant because the question "How?" is the type of question that necessarily invites a response. The officer's question was designed for the purpose of eliciting a response he knew or should have known was reasonably likely to be incriminating. *State v. Banks*, 322 N.C. 753, 760, 370 S.E.2d 398, 403 (1988). Although Officer Varner testified that he did not expect the response he got from defendant, his question improperly elicited clearly incriminating information from defendant and therefore defendant's statement was not spontaneous.

Because we have determined that defendant was in fact interrogated by Officer Varner, defendant's Fifth Amendment rights were violated unless the appropriate warnings were given to defendant before the interrogation, and defendant knowingly and intelligently waived those rights.

In this case, defendant was read his *Miranda* rights on 1 April 1998 at 4:59 p.m. After his arrest, he was not given a new set of warnings, nor did Officer Varner give defendant any warnings. *Miranda* warnings retain efficacy, so long as "no inordinate time elapses between the interrogations, the subject matter of the questioning remains the same, and there is no evidence that in the interval between the two interrogations anything occurred to dilute the first warning[.]" *State v. McZorn*, 288 N.C. 417, 433, 219 S.E.2d 201, 212 (1975), *vacated in part*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976). The

"need for a second warning is to be determined by the 'totality of the circumstances' in each case." *McZorn*, 288 N.C. at 434, 219 S.E.2d at 212 (citing *Commonwealth v. Ferguson*, 444 Pa. 478, 282 A.2d 378 (1971)). In this case, defendant's meeting with his counsel, as well as his arrest and the passage of nineteen hours, diluted the first and only warning given to defendant. Defendant's waiver on 1 April 1998 was invalid as to Officer Varner's custodial interrogation of defendant on 2 April 1998 and the statements arising from that interrogation.

We find that Officer Varner's question to defendant was designed to elicit an incriminating response and constituted interrogation by the police in violation of defendant's Fifth Amendment right to counsel; therefore, the trial court erred in not suppressing defendant's response to Officer Varner's question.

## C. Prejudicial error

"A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b) (1999). As defendant argues

> [d]efendant's veracity and truthfulness of the more detailed alleged confession given by Defendant the night before was challenged by the evidence that it was merely parroting back what Detective Shusky told him they wanted to hear when they refused to accept his original, truthful statement. The jury was instructed that they were required to consider the circumstances surrounding that alleged confession before deciding what, if any, weight to put on it. . . . The statement allegedly made to [Officer] Varner the following day served to strengthen the State's argument that the confession of the night before should be taken as truthful.

The State does not argue in its brief that admission of defendant's statement to Officer Varner was harmless beyond a reasonable doubt and has thus failed to meet its burden. We find that defendant's Fifth Amendment right to counsel was violated and we cannot determine beyond a reasonable doubt that the admission of Officer Varner's testimony was harmless. Defendant must therefore be granted a new trial.

II.

[3] Because the alleged error argued in defendant's first assignment of error may occur at retrial of defendant's case, we next address defendant's contention that the trial court's instructions to the jury deprived defendant of his state and federal rights to due process of law.

First degree felony murder is "[a] murder which shall be . . . committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon[.]" N.C. Gen. Stat. § 14-17 (1999). In order to prove felony murder on the basis of felony child abuse, the State must "prove that the killing took place while the accused was perpetrating or attempting to perpetrate felonious child abuse with the use of a deadly weapon." *State v. Pierce*, 346 N.C. 471, 493, 488 S.E.2d 576, 589 (1997). "When a strong or mature person makes an attack by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons." *Id.*

The trial court instructed the jury that it is their "duty to decide from [all the] evidence what the facts are." The trial court also instructed the jury in part that to sustain the charge of first degree felony murder, the State must prove beyond a reasonable doubt that: (1) defendant committed felonious child abuse, (2) "that while committ[ing] felonious child abuse . . . defendant killed the victim with a deadly weapon," (3) defendant's actions were "a proximate cause of the victim's death," and (4) "that the felonious child abuse was committed or attempted with the use of a deadly weapon." The trial court explained that

> [a] deadly weapon is a weapon which is likely to cause death or serious bodily injury. . . . Hands or fists used against an infant of tender years *may* be considered deadly weapons. In determining whether one's hands or fists are deadly weapons, you should consider the nature, the manner in which they were used, and the size and strength of the defendant as compared to the victim. When a strong or mature person makes an attack by hands alone u[p]on a small child, the jury *may* infer that the hands were used as deadly weapons and you may infer that the act was unlawful and done with malice, *but you are not compelled to do so.*

(emphasis added). Upon review, "[a]s to the issue of jury instructions, we note that choice of instructions is a matter within the trial court's

discretion and will not be overturned absent a showing of abuse of discretion." *State v. Nicholson,* 355 N.C. 1, 66, 558 S.E.2d 109, 152 (2002).

Defendant argues that the above jury instruction "impermissibly reduce[d] the State's burden of convincing the jury beyond a reasonable doubt that Defendant's hands were used as a deadly weapon." Defendant argues that the inference the jury was instructed it could draw was "overbroad" because it

> permitted the jury to find an element of the offense, hands used as a deadly weapon, without considering all of the evidence presented at the trial, particularly the evidence [that] Alex's liver condition created a condition where death would result from a blow which was not likely to cause death or great bodily harm to a small child.

We find that the trial court did not abuse its discretion in its jury instruction. As noted by the State in its brief, the trial court made it clear to the jury that the jury was not "compelled to infer anything, and that it was free to decide from all the evidence whether defendant's hands had been used as a deadly weapon." The instructions given were based upon our Supreme Court's decision in *Pierce* and did not improperly reduce the State's burden of proving its case beyond a reasonable doubt. This assignment of error is overruled.

III.

**[4]** Because the alleged error argued in defendant's third assignment of error might occur on retrial, we elect to address defendant's contention that the trial court improperly permitted the State to offer evidence of prior injuries to Alex's ear and head, as well as the opinion testimony of Dr. Lantz that Alex suffered from battered child syndrome.

Expert testimony that is helpful to the jury in carrying out its role in determining the truth is admissible if based on a proper foundation. N.C. Gen. Stat. § 8C-1, Rule 702 (1999). "Expert medical opinion has been allowed on a wide range of facts, the existence or non-existence of which is ultimately to be determined by the trier of fact." *State v. Wilkerson,* 295 N.C. 559, 568, 247 S.E.2nd 905, 910 (1978) (citations omitted). The trial court has the duty to act as gatekeeper and to insure that expert opinion is properly founded on scientifically reliable methodology. *Daubert v. Merrell Dow,* 509 U.S. 579, 125 L. Ed. 2d

469 (1993); *see also State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995).

"A child who has been diagnosed with 'battered child syndrome' has suffered severe and numerous injuries such that it is logical to presume that the injuries were not caused by accidental means or by an isolated contact with a stranger, but instead were caused intentionally by the child's caretaker." *State v. Noffsinger*, 137 N.C. App. 418, 424, 528 S.E.2d 605, 609-10 (2000) (citing *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978)). Upon a diagnosis that a child suffers from battered child syndrome, "a permissible inference arises that the child's caretakers intentionally inflicted his injuries." *Noffsinger* at 424, 528 S.E.2d at 610.

Dr. Lantz was tendered as an expert in battered child syndrome based upon his education, training and experience. The jury was instructed that when listening to Dr. Lantz's testimony, they must "consider each expert opinion in evidence and give it the weight you think it deserves. You may reject it entirely if you find that the alleged facts upon which it has been based is untrue or the support of the opinions are not sound." Dr. Lantz testified that based upon a review of Alex's medical records and the autopsy report, it was his opinion that Alex "did suffer from Battered Child Syndrome."

Defendant argues that an opinion that Alex suffered from battered child syndrome, based on the soft spot on Alex's head and the ear injury, is error because "[i]t is unlikely that any child will not have suffered at least two significant injuries at some point and that his parents will not be able to discover the actual source of at least one of them." Further, defendant argues that Dr. Lantz's testimony is "far removed" from what our courts have found admissible as evidence of battered child syndrome.

The State argues that evidence regarding Alex's prior injuries is relevant and admissible even if it cannot be directly linked to the crimes charged. The State also argues that the jury was correctly instructed to give the expert testimony whatever weight it thought was deserved. Further, the State contends that Dr. Lantz possessed an expertise, such that a lay person would not have, to testify about battered child syndrome.

We find that the opinion expressed by Dr. Lantz in this case, although partially based on minimal evidence of prior injuries, fell within the bounds of permissible medical testimony. The basis for Dr. Lantz's expert opinion was his experience and education, as well as

his review of Alex's medical records and the autopsy report. Evidence of the prior injuries was relevant to Dr. Lantz's diagnosis of battered child syndrome. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (1999). Defendant presented evidence regarding Alex's prior injuries through Dr. Friedlander. The jury was permitted to weigh the opinions of both Dr. Friedlander and Dr. Lantz, and was not compelled to find facts one way or another. We find that the level of evidence relied upon by Dr. Lantz, although minimal, was sufficient for his diagnosis.

New trial.

Judge SMITH concurs.

Judge HUNTER concurs in part and dissents in part with a separate opinion.

HUNTER, Judge, concurring in part, dissenting in part.

I concur with the majority with respect to Parts II and III of the opinion. However, because I would hold that the trial court did not err in denying defendant's motion to suppress his statement to Officer Varner, I dissent as to Part I. The majority holds that the trial court erred in failing to suppress the statement as being in violation of the Fifth Amendment because Officer Varner initiated an interrogation of defendant without re-informing him of his *Miranda* rights and without an express waiver of those rights. I disagree, and would uphold the trial court's extensive findings and conclusions that defendant's statement was a spontaneous statement not the result of any police-initiated interrogation or inducement, and that defendant made the statement freely, voluntarily and with knowledge of his constitutional rights to remain silent and to have an attorney present.

"A trial court's ruling on a motion to suppress is conclusive on appeal 'if [it is] supported by competent evidence.' " *State v. Buchanan*, 355 N.C. 264, 265, 559 S.E.2d 784, 785 (2002) (citation omitted). Such a ruling is conclusive notwithstanding evidence to the contrary. *State v. Young*, 148 N.C. App. 462, 465, 559 S.E.2d 814, 817, *appeal dismissed and disc. review denied*, 355 N.C. 500, 564 S.E.2d 233 (2002). " 'This deference is afforded the trial judge because he is in the best position to weigh the evidence, given that he has heard all

STATE v. STOKES

[150 N.C. App. 211 (2002)]

of the testimony and observed the demeanor of the witnesses.' " *Id.* (quoting *State v. Hughes*, 353 N.C. 200, 207, 539 S.E.2d 625, 631 (2000)).

Here, the trial court found, and I believe the evidence supports, that Officer Varner was looking into defendant's cell as he walked by; that "defendant spontaneously said to Officer Varner, 'What do you want?' "; that Officer Varner simply responded " 'How?' "; that defendant then "spontaneously" told Officer Varner something to the effect that "he kept crying, and I lost it and there ain't nothing I can do but the time now"; that defendant appeared calm during the exchange; and that Officer Varner thereafter simply walked away. Based on these findings, the trial court concluded that the statement was not made as a result of any inducement or persuasion, that defendant made the statement freely, voluntarily, and with full knowledge and understanding of his constitutional rights, and therefore, that defendant's constitutional rights had not been abridged.

The trial court's finding that defendant spontaneously and without persuasion or inducement initiated a conversation with Officer Varner which led to the inculpatory statement was clearly supported by competent evidence in the form of Officer Varner's testimony, and is therefore conclusive. This finding supports the trial court's conclusion of law that there was no violation of defendant's constitutional rights. It is well-established that " ' "*Miranda* warnings and waiver of counsel are required only when an individual is being subjected to custodial interrogation." ' " *State v. Parks*, 148 N.C. App. 600, 606, 560 S.E.2d 179, 184 (2002) (citations omitted). Custodial interrogation is defined as " ' "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." ' " *Id.* (citations omitted).

In *Parks*, we recently held that the defendant's inculpatory statements were not made in the context of a police-initiated interrogation where the evidence clearly showed that the defendant initiated the conversation that led to the inculpatory statements. *Id.* at 607, 560 S.E.2d at 184. The evidence showed that the defendant initiated contact with the officer by asking him whether he was in trouble. Defendant thereafter made several incriminating statements during the conversation which ensued as a result of defendant's initial question to the officer. We held that the officer's testimony "clearly establishes that defendant initiated the conversation which led to his inculpatory statements," and therefore, "[d]efendant did not make the

inculpatory statements in the context of a police-initiated interrogation, and thus was not required to have been informed of his *Miranda* rights." *Id.* at 607, 560 S.E.2d at 184; *see also State v. Taylor*, 332 N.C. 372, 384, 420 S.E.2d 414, 421 (1992) (defendant's Fifth Amendment rights were not implicated where defendant initiated conversations which lead to his incriminating statements).

In a similar case, our Supreme Court reiterated that an interrogation does not ensue where the defendant initiates the contact. *See State v. Todd*, 313 N.C. 110, 326 S.E.2d 249 (1985). In that case, the evidence established that the officer happened to be standing nearby the defendant's jail cell when the defendant indicated that he wanted to speak to the officer, and a conversation ensued wherein defendant made incriminating statements. *Id.* at 115, 326 S.E.2d at 252. The Supreme Court rejected the defendant's argument that he had been subjected to a custodial interrogation, stating that although all the parties conceded the statement was made while the defendant was in custody, "we agree with the State and the trial judge that the statement was not made as a result of interrogation. Both the circumstances surrounding the statement and the substance of the statement are clear indications that it was volunteered." *Id.* at 116, 326 S.E.2d at 253; *see also, e.g., State v. Coffey*, 345 N.C. 389, 401, 480 S.E.2d 664, 671 (1997) (even assuming the defendant was being interrogated at the time he made incriminating statements, no constitutional violation occurred where "the trial court correctly concluded that defendant initiated the communication with the law enforcement officers").

I would hold that we are bound by the trial court's finding that defendant spontaneously initiated the conversation with Officer Varner, who happened to walk by his cell, by asking Officer Varner what he wanted, and that this finding supports a conclusion that defendant did not make the subsequent statement in the context of a police-initiated custodial interrogation.

Moreover, I would uphold the trial court's conclusion that defendant's statement was made after he freely, knowingly, and voluntarily waived his right to remain silent, his right to have an attorney present, and all other applicable rights. In *State v. Morganherring*, 350 N.C. 701, 722, 517 S.E.2d 622, 634-35 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 322 (2000), our Supreme Court rejected the defendant's argument that he did not knowingly waive his Fifth and Sixth Amendment rights because there was no evidence in the record that the defendant's confession was anything but voluntary. The record in

this case likewise fails to show that defendant's incriminating statement or waiver of his rights was anything but voluntary and knowing. "A trial court's finding of voluntariness, when supported by competent evidence, is conclusive on appeal." *State v. Samuels*, 25 N.C. App. 77, 78-79, 212 S.E.2d 393, 394 (1975) (holding no violation of defendant's constitutional rights where trial court found that defendant's statements were made " 'suddenly, spontaneously and voluntarily,' " and not in response to interrogation, and such findings were supported by competent evidence).

We stated in *State v. Morrell*, 108 N.C. App. 465, 424 S.E.2d 147, *appeal dismissed, disc. review denied and cert. denied*, 333 N.C. 465, 427 S.E.2d 626 (1993), that the voluntariness of a confession must be determined in light of the totality of the circumstances. *Id.* at 474, 424 S.E.2d at 153. We stated that some factors to consider in assessing whether a confession was voluntary are " 'whether the defendant was in custody when he made the statement; the mental capacity of the defendant; and the presence of psychological coercion, physical torture, threats, or promises.' " *Id.* at 474-75, 424 S.E.2d at 153 (citation omitted). In applying those factors, we noted that although the defendant was in custody, that factor alone is not determinative. *Id.* at 475, 424 S.E.2d at 153. The trial court found that the statements were freely given as they were not the product of any threat, promise, or duress, and that the defendant was not suffering from any mental or emotional disorder, nor was she impaired or disabled. *Id.* Based on those findings, the trial court concluded the statements were voluntary. *Id.* We upheld the conclusion, noting that we are bound by the trial court's findings, which were supported by competent evidence. *Id.*

In the present case, the trial court's findings establish that there was no persuasion or inducement, that defendant was calm, and that both his initiation of the conversation and subsequent incriminating statement were made "spontaneously." Indeed, the evidence shows that in response to defendant's question, Officer Varner simply said one word. There is no evidence, and defendant does not argue, that he was otherwise impaired by any mental or emotional disorder or disability that would have prevented him from understanding the nature of his statement and the waiver of his constitutional rights.

In summary, the evidence supports the trial court's findings of fact that defendant initiated the conversation with Officer Varner, that Officer Varner responded with one word, and that defendant, with a calm and collected demeanor, subsequently made a sponta-

COUNTRY CLUB OF JOHNSON CTY., INC. v. U.S. FIDELITY & GUAR. CO.

[150 N.C. App. 231 (2002)]

neous incriminating statement. These findings support a conclusion that there was no police-initiated custodial interrogation, and that defendant spontaneously volunteered the statement without persuasion and after a voluntary and knowing waiver of his rights. The record fails to show any violation of defendant's Fifth Amendment rights. Accordingly, I would affirm the trial court's denial of defendant's motion to suppress, and thus find no error in defendant's trial.