STATE OF NORTH CAROLINA v. RICHARD ALLEN STOKES

No. 275A02

(Filed 13 June 2003)

**Evidence— rebuttal—impeachment testimony**

The trial court did not err in a first-degree felony murder and felonious child abuse case by admitting in rebuttal as impeachment testimony defendant's statement to an officer about defendant's treatment of a minor child on the night of the minor child's death, made approximately nineteen hours after defendant was given his Miranda rights, because: (1) the cross-examination questions of defendant about his statement to the officer were

proper; (2) the officer was properly called as a rebuttal witness when the impeaching evidence pertained to the substance of defendant's statement; (3) even assuming arguendo that defendant properly preserved plain error review concerning whether the statement was in fact admitted as substantive evidence rather than as impeaching evidence, the alleged error did not arise to the level of plain error; (4) defendant failed to object to the prosecutor's characterization of the statement during closing argument, and it was not so grossly improper that the trial court abused its discretion by failing to intervene ex mero motu; and (5) the trial court instructed the jury that defendant's statement to the officer was being made for the limited purpose of impeaching defendant's truthfulness.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 150 N.C. App. 211, 565 S.E.2d 196 (2002), ordering a new trial after appeal from a judgment entered 29 February 2000 by Judge Michael E. Beale in Superior Court, Davidson County. On 15 August 2002, the Supreme Court granted discretionary review of an additional issue. Heard in the Supreme Court 10 March 2003. Upon consideration of the briefs filed with this Court and after hearing oral argument, on 10 March 2003, this Court allowed the State's petition for discretionary review as to an additional issue.

*Roy Cooper, Attorney General, by Robert J. Blum, Special Deputy Attorney General, for the State-appellant.*

*Danny T. Ferguson for defendant-appellee.*

*Robinson, Bradshaw & Hinson, P.A., by Joshua F.P. Long; and Seth H. Jaffe, General Counsel, on behalf of the American Civil Liberties Union North Carolina Legal Foundation, amicus curiae.*

EDMUNDS, Justice.

Defendant was convicted of first-degree felony murder and of felonious child abuse and was sentenced to life imprisonment without parole. Defendant appealed to the Court of Appeals, which, in a split decision, found error and ordered a new trial. The State of North Carolina appealed as of right and petitioned for discretionary review as to additional issues. This Court allowed discretionary review as to one issue. After hearing oral argument, this Court sought briefing

from the parties as to an additional issue. We reverse the Court of Appeals and reinstate defendant's conviction.

The victim in the case, two-year-old Alexander Ray Asbury (Alex), was the son of Tricia Burnette (Tricia), who went by the name Tricia Asbury at the time of the offense. Alex, Tricia, and defendant had been living together for several months. At approximately 9:30 p.m. on 31 March 1998, Tricia put Alex to bed. She turned in about a half-hour later, and defendant followed shortly thereafter. Just before 4:00 a.m. the next morning, 1 April 1998, defendant yelled to Tricia from Alex's room that Alex was not breathing. Tricia called 911. Defendant attempted to perform CPR on Alex, but when the emergency medical technicians responded, they found that Alex was not breathing and had no pulse. Alex was transported to Wake Forest University Medical Center, where he was pronounced dead at 4:52 a.m.

On the afternoon of 1 April 1998, Detective Sergeant David McDade of the Davidson County Sheriff's Department went to the funeral home to meet defendant. After Detective McDade explained that he was participating in the investigation of Alex's death, defendant voluntarily accompanied Detective McDade to the Sheriff's Department, where he was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). Defendant acknowledged that he understood his rights and said he was willing to talk to Detective McDade without a lawyer present. During the following extended interview, defendant made several statements. He began by claiming that he had nothing to do with Alex's death. He said that when he checked Alex around 4:00 a.m., he saw that Alex's fingers were blue. This statement was reduced to writing. About two hours later, defendant made an oral statement during which he said, "[I]f I did it, I don't remember it, just give me the death penalty or I will do it in jail." Detective McDade wrote this comment down, and shortly thereafter, defendant signed a similar written statement in which he said that he did not remember being abusive to Alex but that if he had been, it was not intentional. Later during this same interview, defendant admitted striking Alex: "I told Alex to go to sleep and I hit him in the head with my right hand half open, fingers closed. I guess I lost it." Detective McDade transcribed this statement, and defendant signed it. Questioning of defendant ended in the early morning hours of 2 April 1998. He was then arrested and taken to a jail cell.

Defendant's father and sister retained counsel for him at approximately 8:30 a.m. on 2 April 1998, and defendant met with his attorney

**STATE v. STOKES**

[357 N.C. 220 (2003)]

for about an hour at approximately 10:00 a.m. that day. However, at about noon on 2 April 1998, Davidson County Sheriff's Deputy Todd Varner, who then held the rank of patrol sergeant and had been participating in the investigation, went to defendant's cell to see who had been arrested in the case.[1] According to Varner, defendant asked him, "What do you want?" and Varner answered with the word "How." Varner described defendant's response as, "He just kept crying, 'I lost it, there ain't nothing I can do but the time now.' "

Defendant moved to suppress all statements made by him. After conducting an evidentiary pretrial hearing on the motion, Judge James C. Davis entered an order denying the motion to suppress. However, at defendant's trial before Judge Michael E. Beale, the State presented evidence in its case-in-chief of the statements made by defendant to Detective McDade before he met with his attorney but did not present evidence of defendant's later statement to Varner. In addition, Tricia's mother testified that, on the evening before he died, Alex had appeared healthy and active, though he had twice run into a piece of furniture and hit his head. She stated that the impacts did not cause a bruise or break the skin, and she did not feel that Alex needed medical treatment as a result of these mishaps.

Dr. Patrick Lantz, the forensic pathologist who performed the autopsy, testified as to his observations of Alex's body. He saw that Alex

> had a small bruise between his right eyebrow and the hairline, which was about a quarter of an inch in size, then he had a smaller one than that, a small little bruise right at the corner of his eyebrow on the right side. He also had a small little bruise on the left side. Looking through the hair, I could actually see that there was some bruising of the scalp on the right and left side in the hair, farther back on the forehead, both on the right and the left side.

He concluded that Alex's death was caused by "cerebral edema or swelling of the brain due to an intracranial injury from blunt trauma of the head." Dr. Lantz did not believe that Alex's injuries were consistent with running into a piece of furniture. Instead, it was his opinion that Alex's head trauma could be "consistent with a mature adult taking his right hand, folding it . . . and striking th[e] child."

---

1. Patrol Sergeant Varner had been promoted to lieutenant at the time of defendant's trial. For consistency and to avoid confusion, we shall refer to him as "Varner."

Dr. Lantz was also accepted as an expert in the field of battered-child syndrome. After reviewing the records maintained by other physicians who treated Alex, along with hospital records, Alex's computerized axial tomography scan, and other related materials, Dr. Lantz testified that he was of the opinion that Alex suffered from battered-child syndrome. In addition, another witness stated that she had observed injuries to Alex's ear and head approximately two months before his death.

Defendant testified on his own behalf. He stated that he did not notice anything unusual about Alex's condition when he helped Tricia put the child to bed the evening of 31 March 1998. He admitted that he smoked marijuana that night but denied that he ever smoked marijuana or drank alcohol around Alex. He testified that he checked on Alex around midnight and observed that he was breathing regularly. However, when he checked again around 3:55 a.m., he saw that Alex's fingers were blue. He attempted CPR on Alex while calling for Tricia to dial 911. He claimed that the admissions contained in his signed statements were coerced and not true. He also denied ever hitting Alex. In addition, defendant presented expert evidence supporting a theory that Alex suffered from Reyes Syndrome or a similar condition and that the injuries could have resulted from some cause other than being struck by a fist.

As noted above, the prosecution did not introduce evidence of defendant's statement to Varner during its case-in-chief. The first testimony pertaining to this encounter was provided by defendant. During his direct testimony, defendant stated that a uniformed individual approached and stood before his cell for several seconds. Defendant testified that he asked the individual, "[W]hat do you want?" According to defendant, the individual commented that he had children of his own, then asked defendant, "[W]hy did you do it?" Defendant testified that he responded by saying, "I didn't do anything." Defendant went on to testify that the individual asked, "[W]hy did you write this statement, confession?" and defendant responded, "I f---ed up." The uniformed individual then departed.

On cross-examination, defendant denied that the uniformed individual had said to him the word, "How." Over objection, he further denied telling this individual, "I lost it. Ain't nothing I can do but the time now." The prosecutor then called Varner as a rebuttal witness. Varner testified that, on his own initiative, he went to defendant's cell to see who had been charged in Alex's death. When defendant asked, "What do you want?" Varner testified that he responded by saying

only the word "How." Defendant then "just kept crying, 'I lost it, there ain't nothing I can do but the time now.'" Varner further testified that he and defendant swapped a few inconsequential comments, and then he left the cell area.

The Court of Appeals' majority held that the superior court erred in ruling that defendant's statement to Varner, made approximately nineteen hours after defendant was given his *Miranda* rights, was voluntary. The Court of Appeals concluded that the encounter was an interrogation and that enough time had passed and a sufficient number of legally significant events had taken place in the meantime to vitiate the *Miranda* warnings. Accordingly, the Court of Appeals held that the taking of defendant's statement violated defendant's Fifth Amendment right against self-incrimination. The dissenting judge disagreed and argued that defendant's statement was given voluntarily. *State v. Stokes*, 150 N.C. App. 211, 227, 565 S.E.2d 196, 207 (2002) (Hunter, J., dissenting). However, we are not called upon to determine whether the trial court correctly determined that the statement was admissible because the testimony was never offered as direct evidence. Instead, the statement was tendered only after defendant took the stand and, while under oath, denied making the comment described above to Varner. Therefore, we must determine whether defendant's statement was properly admitted in rebuttal as impeachment testimony.

First, assuming without deciding that the statement to Varner was made in violation of defendant's constitutional right against self-incrimination, we consider whether he could be cross-examined about the statement. This Court addressed a similar issue in *State v. McQueen*, 324 N.C. 118, 377 S.E.2d 38 (1989). In that case, the defendant was charged with the murder of a highway patrol officer. The State presented evidence that, as part of the offense, the defendant had also kidnapped an individual named Barker. *Id.* at 121-23, 377 S.E.2d at 40-42. The State's case included evidence that the defendant had left Barker's car while carrying a rifle, a pistol, and a box of ammunition. However, when the defendant was arrested, he had only two pocketknives in his possession. After his arrest, the defendant was advised of his *Miranda* rights, made several statements, and then told the investigators that he wanted a lawyer. *Id.* at 127-30, 377 S.E.2d at 43-45. At trial, the defendant's cross-examination of the arresting officers included questions that pointed out that the firearms had not been found. When the defendant took the stand, he testified that he had only a knife when he left Barker's car. On cross-

examination, the prosecutor asked the defendant about statements he made to investigators after asking for counsel. While suggesting that these statements were "otherwise inadmissible," this Court held that the questions were proper impeachment.

> "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment."

*Id.* at 134-35, 377 S.E.2d at 48 (quoting *Harris v. New York*, 401 U.S. 222, 225-26, 28 L. Ed. 2d 1, 4-5 (1971)). Accordingly, as in *State v. McQueen*, the cross-examination questions of defendant here about his statement to Varner were proper.

We next consider whether Varner was properly called as a rebuttal witness. "Under certain circumstances a witness may be impeached by proof of prior conduct or statements which are inconsistent with the witness's testimony." *State v. Whitley*, 311 N.C. 656, 663, 319 S.E.2d 584, 589 (1984); *see also* N.C.G.S. § 8C-1, Rule 607 (2001). We have held that when a witness is confronted with prior statements that are inconsistent with the witness' testimony, the witness' answers are final as to collateral matters, but where the inconsistencies are material to the issue at hand in the trial, the witness' testimony may be contradicted by other testimony. *State v. Green*, 296 N.C. 183, 192-93, 250 S.E.2d 197, 203 (1978). There can be no doubt that any statement defendant made to Varner about his treatment of Alex on the night of Alex's death is material to the central issue of this trial. Moreover, the impeaching evidence pertained to the substance of defendant's statement. *See State v. Williams*, 322 N.C. 452, 456, 368 S.E.2d 624, 626 (1988). Accordingly, we hold that Varner's testimony rebutting defendant's cross-examination responses to the prosecutor was properly admitted.

Defendant argues that the State is improperly changing its theory of the case. He points out that the State's position before the Court of Appeals was that the statement was admissible because it was given voluntarily. The Court of Appeals' opinion and dissent analyzed the

issue of the statement's admissibility as though it had been offered as substantive evidence. Defendant contends that this Court is limited to reviewing the issues raised in the dissent in the Court of Appeals and also that the State is precluded from raising a new theory for the first time before us. However, as defendant also properly acknowledges, this Court has the inherent power to supervise the other courts of this state. *State v. Williams*, 274 N.C. 328, 333, 163 S.E.2d 353, 357 (1968). We allowed the State's petition for discretionary review as to this issue. Accordingly, we may consider whether defendant's statement to Varner was properly admitted as impeaching evidence.

Defendant also maintains that the statement was in fact admitted as substantive evidence rather than as impeaching evidence and that the error was compounded when the prosecutor argued to the jury that the statement should be considered as substantive evidence. As to the first of these contentions, although defendant made a pretrial motion to suppress the statement, he did not object when it was offered and admitted at trial. *See State v. Golphin*, 352 N.C. 364, 405, 533 S.E.2d 168, 198 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). In the absence of a contemporaneous objection, we review for plain error. *State v. Gary*, 348 N.C. 510, 518, 501 S.E.2d 57, 63 (1998). Because defendant has not asserted plain error, this review is waived. *See id.* However, even assuming *arguendo* that defendant properly preserved plain error review and that the trial court committed some error in admitting the statement, we do not find that the alleged error arises to the level of plain error. *See id.* As to defendant's second argument, relating to the prosecutor's characterization of the statement during closing argument, defendant again did not object. We have reviewed the prosecutor's argument and conclude that it was not so grossly improper (if it was improper at all) that the trial court abused its discretion in failing to intervene *ex mero motu. See State v. Richmond*, 347 N.C. 412, 433, 495 S.E.2d 677, 688 (1998). In addition, we note that the trial court instructed the jury as follows:

> The State contends, and the defendant denies, that the defendant made false, contradictory or conflicting statements. If you find that the defendant made such statements, they may be considered by you as a circumstance tending to reflect the mental process of a person possessed of a guilty conscience seeking to divert suspicion or to exculpate themselves and you should consider that evidence along with the other believable evidence

in this case. However, if you find that defendant made such statements, they do not create a presumption of guilt and such evidence standing alone is not sufficient to establish guilt. Such evidence may not be considered by you in any way as tending to show premeditation and deliberation . . . .

This instruction was adequate to advise the jury that defendant's statement to Varner, which he denied making, was being admitted for the limited purpose of impeaching defendant's truthfulness.

In light of this result, we determine that this Court improvidently granted discretionary review as to whether the passage of time diluted the reading of defendant's *Miranda* rights.

The opinion of the Court of Appeals is reversed.

REVERSED; DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED IN PART.