HUNTER, JR., ROBERT N., Judge.
Jemil Taylor ("Defendant") appeals from a judgment after a jury found him guilty of discharging a weapon into an occupied dwelling. Defendant contends the trial court erred by not allowing defense counsel to impeach one of the State's witnesses by use of extrinsic evidence of prior inconsistent statements. We conclude that exclusion of the impeachment testimony does not constitute reversible error.
I. Factual & Procedural History
On 4 June 2013, Defendant was indicted on one count of discharging a weapon into an occupied dwelling pursuant to N.C. Gen.Stat. § 14.34.1(a). The trial court granted the State's motion to join at trial charges of felony conspiracy and possession of a firearm by a felon that allegedly arose from the same incident. From 19 to 23 May 2014, Defendant was tried in Wake County Superior Court before the Honorable Carl R. Fox. The evidence presented at trial reveals the following pertinent facts.
Bryan Harris testified that on 12 April 2013, he was hosting a cookout at his mother's house. At some point that night, Bryan saw and confronted Jaime Wright, a childhood friend, because Bryan heard Jaime had been "talking junk" about him. After yelling at each other, the two started fighting, and Jaime stabbed Bryan across the chest. Bryan's father, Terry Harris, stepped in to break it up. Jaime called Bryan later that night and accused Bryan and the Harris family of jumping him.
Terry Harris testified that during the afternoon of the next day, on 13 April 2013, he saw Jaime at another cookout but did not speak with him. Terry then drove home to 225 Howard Road, in Fuquay-Varina, to pick up his fiancée, Elizabeth Allen, and bring her back to the cookout. Terry testified that as he was preparing to get in the shower, he heard a series of gunshots. He followed the noise outside and went onto his porch, where he saw three men: one was running away and Terry did not see his face; two were standing beside a white barn on the other side of a fence bordering Terry's property and holding guns. Terry recognized one man as Jaime and the other Terry recognized, but he did not know his name at the time. The second man Terry later identified by his street name "Rude Boy."
Terry further testified that when he asked Jaime and Rude Boy what they were doing, the two men turned and ran. Terry stated that Elizabeth ran to the yard and told him the men shot at his Cadillac Escalade. Terry then saw a silver Dodge Intrepid and silver Pontiac G6 drive away fast. Terry recognized the silver Dodge Intrepid as belonging to Henry[1] Rowland and the silver Pontiac G6 as belonging to Defendant. Terry then ran into his house, grabbed his car keys, and drove after the two silver cars. Terry followed the vehicles for a short period but soon lost sight of them and then returned home to speak with law enforcement when they arrived a few minutes later.
Carl Diggs, Terry's second cousin, testified that on the evening of 13 April 2013, he was sitting on his porch of his home located at the dead end of Howard Road when he saw two silver cars turn around in his driveway and then park in an area in between Carl's and Terry and Elizabeth's home. Carl did not recognize the cars, so he went inside his house and, within two or three minutes, he heard several gunshots. He ran outside to follow the noise and saw three men run out of Elizabeth and Terry's yard, hop into the two parked cars, and drive away "[a]bruptly." Carl stated that he saw at least "one of the guys had a gun in his hand as he was leaving." After they pulled away, Carl called Elizabeth on the telephone and, a few minutes later, went over to their home and spoke with law enforcement.
Elizabeth, Terry's fiancée, testified that at approximately 6:00 p.m. on 13 April 2013, Terry came home and invited her to return with him to a cookout that evening. As they were getting dressed to leave, Elizabeth heard four gunshots. She moved to her second bedroom toward the front of the house and heard three more gunshots. One bullet "came through the house" and "hit the door" of the bedroom where Elizabeth was standing. Elizabeth testified that she ran outside and saw "two guys running from the fence." Both men had guns in their hands. She hollered and they turned. Elizabeth testified she recognized one of them as Jaime and saw a man she did not recognize at that time, who she later identified as Defendant. Elizabeth then ran out to the road and saw the two silver cars drive out fast from the dead end on Howard Road. She captured both cars' license plate numbers and recorded their tag numbers onto a napkin, but she was unsure of the last character of the silver Pontiac G6's tag. Elizabeth testified that immediately after the incident, she called the Wake County Sherriff's Office.
Deputy John Faucett of the Wake County Sherriff's Office testified that he responded to a call on 13 April 2013 around 7:22 p .m. about the shootings. Deputy Faucett arrived within minutes and spoke with Terry and Elizabeth about the incident. Deputy Faucett then got descriptions of the suspects, received the vehicles' license plate numbers, and then called the Raleigh/Wake City-County Bureau of Identification ("CCBI"). As Deputy Faucett was in his patrol vehicle typing his report, Elizabeth, Terry, and Elizabeth's daughter were trying to put together names of the men they had seen and the drivers of the vehicles. Deputy Faucett ran the vehicles' tags and discovered the silver Pontiac G6 was registered to Defendant and the silver Dodge Intrepid was registered to Henry. Elizabeth eventually gave Deputy Faucett the names of Henry Rowland, Jaime Wright, and someone with the street names of "Wall Out" or "Scream Face," later associated with Defendant. Deputy Faucett waited for CCBI to arrive, stayed at the scene for a few hours, and then departed.
Later that evening, after the CCBI left, Elizabeth testified that Bryan came over to her house. Bryan was approximately the same age of the two men Elizabeth saw and "knew everybody in the area." Elizabeth testified she described to Bryan the man she did not recognize and told him that he drove a silver Pontiac G6; Bryan identified a man with the street name of "Wild Out." After speaking with Bryan, Elizabeth testified that she and Terry called around and approached people in the neighborhood to identify the man, describing his appearance and what car he drove. These people "were saying 'Wild Out[,]' " and provided his address. Elizabeth and Terry drove there that night, saw the silver Pontiac G6, and Elizabeth confirmed the last number of its license plate and recorded it on the napkin.
Over the next few days, several events occurred. Elizabeth testified that on 14 April 2013, she searched Facebook for Defendant's profile and reviewed several photos of him. Deputy Faucett testified that on 14 April 2013 Terry called him and informed him that Terry and Elizabeth "rode by all three houses of the suspects and that the vehicles were at their houses." At that point, the addresses, cars, and tags were entered into the police report. On 16 April 2013, Investigator Edward Welch of the Wake County Sheriff's Office was assigned the case. Investigator Welch testified that, having followed up with Deputy Faucett's notes, he discovered that the silver Pontiac G6 was registered to Defendant and that the silver Dodge Intrepid was registered to Henry.
On 25 April 2013, Terry and Elizabeth went to the Wake County Public Safety Center to be interviewed about the incident. Investigator Welch interviewed Terry, who stated that he saw Jaime and someone called "Rude Boy," as well as another man running away that he could not see. Sergeant Edward A. Blomgren of the Wake County Sherriff's Office interviewed Elizabeth, who identified Jaime and Defendant as the two men she saw running away. During the interview, Elizabeth stated that she could see clearly the faces of the two males running across the neighbor's yard and that each suspect had a gun. Sergeant Blomgren proceeded to put together a photo lineup of eight photographs for Elizabeth to identify the second suspect. Elizabeth selected Defendant's photograph.
During cross-examination on Elizabeth, defense counsel asked Elizabeth about prior statements she allegedly made to Defendant's mother, Angela Gorham. Elizabeth confirmed that she had spoken to Angela on the telephone around ten times after the incident and testified that she did not realize until after identifying Defendant that Angela was Defendant's mother. Defense counsel then pressed Elizabeth about her allegedly telling Angela that Defendant "didn't have anything to do with [the incident]," and Elizabeth denied ever making such a statement. Specifically, defense counsel asked: "[D]id you indicate that you ... knew her son didn't have anything to do with this?" Elizabeth responded: "Not that I can remember. I mean, ... I've told her that I couldn't believe that [Defendant] would ... have anything to do with [the incident], knowing who [Angela] was." On redirect, the State asked Elizabeth: "Did you ever tell [Angela] that he was not the one you saw?" Elizabeth responded: "No."
When the defense presented its case, Angela was called as the first witness. Angela testified that she had spoken with Elizabeth on the telephone after the incident between twenty and twenty-five times. She began to testify about the nature of their first conversation, but the prosecutor objected and asked to be heard. The trial judge excused the jury. The prosecutor objected on the grounds that the content of the conversation was irrelevant, as it concerned a collateral matter not related to any material fact presented in Elizabeth's testimony. Furthermore, the prosecutor objected on the grounds that Angela's testimony as to Elizabeth's alleged prior statements was hearsay, an impermissible out-of-court statement. The trial judge allowed Angela to testify outside the presence of the jury.
Angela testified that when she first spoke with Elizabeth, Elizabeth stated, "Your son had nothing to do with it." Angela further stated that Elizabeth never retracted this statement and that when Angela told her that Elizabeth must tell the prosecutor that Defendant had nothing to do with it, Elizabeth replied: "I am. I am. I'm telling the DA the truth." Angela testified that Elizabeth made statements such as this on multiple occasions-twenty to twenty-five times. The trial judge sustained the State's objection, disallowing the testimony. The jury returned to the courtroom.
Defendant then took the stand and testified that, on 13 April 2013, he had been playing basketball at the gym with some friends when he first heard about the fight between Jaime and Bryan that occurred on the night before. Defendant testified after the gym closed at 3:00 p.m. that day, he and his friends sat around and talked for a while. Some time later, Defendant testified that he drove across the street to a gas station for gasoline and to purchase a drink. While there, Defendant testified he saw Jaime and three other men pull up in a silver Dodge Intrepid. Defendant and Jaime discussed what happened during the fight. Jaime indicated that he was going to his cousin Carl's house, located at the dead end of Howard Road. Defendant asked if they could "finish [their] conversation over that way." Jaime and the three men hopped into the silver Dodge Intrepid and drove off. Defendant finished filling up his tank and headed toward Carl's house.
Defendant further testified that once he got to Howard Road, he parked behind Jaime's car and talked to him about the fight. Defendant testified that he told Jaime, "It ain't worth it. Leave everything alone.... [J]ust let this stuff go. It's not worth it ." Defendant testified that they spoke for no more than three minutes when Defendant received a call from his girlfriend. Defendant took the call and Jaime and the three other men walked up the street. Defendant stated that he was still at his car and speaking on the phone with his girlfriend when he heard gunshots and dropped to the ground. Defendant testified he ended the call and saw one man run to the silver Dodge Intrepid and pull it forward. Then Defendant testified he heard more gunshots and saw three men jump into the silver Dodge Intrepid and speed off. Defendant then hopped in his silver Pontiac G6 and drove home.
After the close of all the evidence and during a recess, the trial judge allowed defense counsel to place an offer of proof in the record as to Elizabeth's allegedly inconsistent prior statements concerning Defendant's involvement in the incident to corroborate Angela's testimony. Defense counsel first called Yanneka King, who testified that in May 2013, while Angela was doing her hair, Angela received a phone call and put it on speakerphone. Yanneka stated that she heard the woman on speakerphone say "Rude Boy," not Defendant, committed the crime. She testified that she heard the following statement: "I really don't think it was your son, Angie.... I'm really sure it was Rude Boy." The defense then recalled Angela Gorham and she testified that Elizabeth told her "she didn't believe it was [Angela's] son. She knew it was not [her] son. And she also told [Angela] that she was going to tell the DA that it wasn't [her] son[.]" Defense counsel then called Gena Cotton, Defendant's sister, who testified that, in May 2013, when she was with her mother, she heard a lady on the speakerphone say, "Jemil had no involvement in this. I'm going to tell the DA." The defense's exception to the trial judge's decision to disallow those three witnesses' testimony was noted for the record.
On 23 May 2014, the jury found Defendant guilty of discharging a weapon into an occupied dwelling and not guilty of felony conspiracy or possession of a firearm by a felon. The trial judge sentenced Defendant to a term of 44 to 65 months imprisonment. Defendant appeals.
II. Analysis
Defendant contends the trial court erred by disallowing the three witnesses' testimony contradicting Elizabeth's denial during cross-examination of statements she allegedly made concerning Defendant's involvement in the incident. Defendant further contends this testimony should have been allowed to discredit Elizabeth's denial, because whether Elizabeth made such statements involves a material matter where identity of the perpetrator is the central issue. We are not persuaded the trial judge abused his discretion in the instant case.
This Court employs an abuse of discretion standard to review a trial court's decision of whether to admit or exclude evidence of specific instances of conduct for the purpose of impeaching a witness. See Ferebee v. Hardison,126 N.C.App., 230, 235-36, 484 S.E.2d 857, 860 (1997), rev'd in part on other grounds,347 N.C. 346, 492 S.E.2d 354 (1997). Abuse of discretion will be found on appeal only if the ruling is "manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision." State v. White,349 N.C. 535, 552, 508 S.E.2d 253, 264-65 (1998) (citations omitted). Without such a finding, we must affirm the trial court's ruling. Id.
Rule 607 of the North Carolina Rules of Evidence provides broadly that "[t]he credibility of a witness may be attacked by any party[.]" N.C. Gen.Stat. § 8C-1, Rule 607. Rule 608(b) limits credibility attacks on witnesses by providing that "[s]pecific instances of the conduct of a witness ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court,... be inquired into on cross-examination of the witness[.]" N.C. Gen.Stat. § 8C-1, Rule 608(b) (2014) (emphasis added).
Our Supreme Court has held "[e]xtrinsic evidence of a prior inconsistent statement may be used to impeach when the issue is material; however, extrinsic evidence may not be used to impeach concerning collateral matters." State v. Hunt,324 N.C. 343, 348, 378 S.E.2d 754, 757 (1989) (citations omitted). The test to determine whether evidence is material or collateral is "whether the evidence offered in contradiction would be admissible if tendered for some purpose other than mere contradiction." State v. Long,280 N.C. 633, 640, 187 S.E.2d 47, 51 (1972). "[T]estimony contradicting a witness's denial that he made a prior statement when that testimony purports to reiterate the substance of the statement" is a collateral matter. Id.Therefore, "when a witness is confronted with prior statements that are inconsistent with the witness' testimony, the witness' answers are final as to collateral matters,but where the inconsistencies are material to the issue at hand in the trial, the witness' testimony maybe contradicted by other testimony." State v. Stokes,357 N.C. 220, 226, 581 S.E.2d 51, 55 (2003) (citations omitted) (emphasis added). Furthermore, "once a witness denieshaving made a prior inconsistent statement, [a party] may not introduce the prior statement in an attempt to discredit the witness; the prior statement concerns only a collateral matter, i.e., whether the statement was ever made." State v. Wilson,197 N.C.App. 154, 162, 676 S.E.2d 512, 517 (2009) (citations omitted).
Here, Elizabeth denied during cross-examination that she previously previously told Angela that Defendant didn't commit the crime. Defendant sought to introduce extrinsic evidence to contradict Elizabeth's denial by way of three witnesses' testimony-Defendant's mother, Angela, Defendant's sister, Cotton, and a patron of Angela's store, King. The State objected and the trial judge excused the jury. The trial judge then heard both parties' arguments and decided to exclude the testimony. Defense counsel was permitted an opportunity to make a proffer of the evidence for the record. Because the trial transcript reveals that there was thought and reason behind the trial judge's evidentiary ruling, we conclude the trial judge did not abuse his discretion in deciding to exclude the testimony.
Because Elizabeth denied during cross-examination she told Defendant's mother that Defendant did not commit the crime, Defendant was limited to Elizabeth's answer on cross-examination. See Stokes,357 N.C. at 226, 581 S.E.2d at 55. Furthermore, the testimony proffered would only serve to prove whether or not the statement by Elizabeth had been made-not whether Defendant actuallycommitted the offense. See Wilson,197 N.C.App. at 162, 676 S.E.2d at 517. Thus, although Elizabeth's allegedly inconsistent statement implicated the issue of identity, the trial court did not abuse its discretion by excluding Angela's, Cotton's, and King's testimony as impeachment evidence in the instant case. See id.
Furthermore, the trial transcript and record reveals plenary evidence to support the jury's conclusion Defendant was guilty notwithstanding the trial court's decision to exclude Defendant's witnesses' testimony. Elizabeth testified on direct examination she saw clearly the face of the man she later identified as Defendant, that she saw Defendant's car speed away from the crime scene, and that she confirmed Defendant's identity by reviewing several photos contained in his Facebook profile. Terry testified he saw Defendant's car speed away from the house. Carl testified he saw three men run into the two silver cars parked on the side of the road and then speed away fast, implying Defendant was not just standing by his car when the shootings occurred. Additionally, Defendant admitted to being in the vicinity at the time of the shooting and provided no witnesses to support his alibi that he was on the phone at his car during the shootings. Therefore, we conclude the trial court's decision to exclude the testimony did not amount to prejudicial error in the instant case.
III. Conclusion
For the foregoing reasons, we find no reversible error in the below court.
NO ERROR.
Judges STEELMAN and DAVIS concur.
Report per Rule 30(e).
Judge STEELMAN concurred in this opinion prior to 30 June 2015.
Opinion
Appeal by defendant from judgment entered 23 May 2014 by Judge Carl R. Fox in Wake County Superior Court. Heard in the Court of Appeals 3 June 2015.

Throughout the trial, several witnesses call this person "Charles" or "Henry" Rowland, but the evidence presented suggests that they are referring to the same person. For purposes of this opinion, we elect to use the name "Henry."