IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA14-1015

 Filed: 16 February 2016

Wake County, No. 12 CRS 223242

STATE OF NORTH CAROLINA

 v.

THOMAS D. KNIGHT

 Appeal by defendant from judgment entered 7 February 2014 by Judge Kendra

D. Hill in Wake County Superior Court. Heard in the Court of Appeals 22 April 2015.

 Attorney General Roy Cooper, by Assistant Attorney General Amy Kunstling
 Irene, for the State.

 Cooley Law Office, by Craig M. Cooley, for defendant.

 CALABRIA, Judge.

 Defendant Thomas D. Knight (“defendant”) appeals from judgment entered

upon a jury verdict finding him guilty of second degree rape and first degree

kidnapping. We conclude that defendant’s trial was free from prejudicial error.

 I. Background

 In October 2012, forty-six-year-old victim T.H., a divorced mother of two adult

children, resided in Fuquay-Varina. She had a boyfriend but lived alone. T.H. and

defendant—who lived with his girlfriend, Leslie Leicht (“Leicht”)—were neighbors

and had known each other for approximately one year. Over the course of that year,

T.H. and defendant “hung out” at T.H.’s home about ten to fifteen times, mainly to
 STATE V. KNIGHT

 Opinion of the Court

talk, drink alcohol, and smoke marijuana. T.H. also allowed defendant to drive her

car on certain occasions. Whenever they got together, T.H. usually drank three to

four beers, while defendant preferred vodka.

 Although T.H. had a boyfriend and lived alone, she and defendant enjoyed a

light-hearted, platonic relationship. However, defendant occasionally made sexually

suggestive comments such as “once you go black you’ll never go back,” to which T.H.

dismissively replied that she had “made it this far without that so [she would] be

fine.” T.H. felt that defendant was “[j]ust talking junk” and she did not take his

innuendos seriously. But in T.H.’s words, defendant “crossed the line” during an

August 2012 incident.

 On 23 August 2012, defendant came to T.H.’s home and brought her a kitten;

he then “took off.” Nearly an hour later, defendant suddenly entered T.H.’s home

through an open back door, threw her on the bedroom floor, and positioned himself

on top of her. After T.H. asked defendant “[w]hat in the fu**” he was doing[,]”

defendant answered, “[y]ou want this, Bit**.” In response, T.H. hit defendant in the

face and told him to leave her home immediately, which he did. Soon after the

incident, defendant texted T.H. and apologized for scaring her. He also promised that

“it” would never happen again. T.H. accepted defendant’s apology and got together

with him two or three times between August and October of 2012.

 -2-
 STATE V. KNIGHT

 Opinion of the Court

 In the late afternoon of 12 October 2012, T.H. texted defendant and asked him

to get her some marijuana, something he had done for her on several prior occasions.

Defendant agreed, and the two traveled to Angier in T.H.’s car to get the marijuana.

After they returned to T.H.’s residence around 6:30 p.m., T.H. and defendant sat on

the living room couch while drinking, getting high, watching TV, and talking about

their respective relationships. During the course of the evening, defendant drank

vodka straight from the bottle and T.H. consumed five beers along with two shots of

vodka.

 Sometime before 9:30 p.m., defendant abruptly picked T.H. up off the couch,

pinned her arms against her body, and carried her to the bedroom. T.H. screamed at

defendant and asked what he was doing, but he did not respond. Once in the

bedroom, defendant threw T.H. on the bed, held her down, and proceeded to remove

her jeans and underwear as she continued to yell and scream. After unfastening his

pants, defendant vaginally penetrated T.H. for approximately ten minutes before

pausing to proclaim, “now you’re a real woman because you’ve been fu**ed by a black

man,” to which T.H. replied, “well, now you have HIV.” Angered by that reply and

believing that he might contract AIDS, defendant ceased penetrating T.H. and began

hitting her face. Defendant then put his penis in T.H.’s mouth, prompting her to bite

it. Somewhat stunned, defendant backed away, which allowed T.H. to get away from

defendant and run out of the home.

 -3-
 STATE V. KNIGHT

 Opinion of the Court

 Wearing only a sweater, T.H. eventually made it to the home of a neighbor,

Beth Branham (“Branham”), who noticed blood on T.H.’s lower lip. After giving

T.H.—who was distraught and crying—some sweatpants to wear, Branham called

the police. Several officers with the Fuquay-Varina Police Department (“FVPD”)

arrived at Branham’s home, and T.H. told them what happened.

 The officers then proceeded to T.H.’s home, where they found defendant’s white

t-shirt in the front yard. Inside the bedroom, the bed covers were in disarray and

T.H.’s pants and panties were inside out on the floor. In addition, fresh red blood and

hair that seemed to have come from T.H.’s scalp were found on the bedding.

 Meanwhile, defendant had gone to a friend’s house, where Leicht picked him

up in her car. As the two drove home, defendant noticed police cars in the area and

had Leicht drop him off at a nearby gas station. FVPD officers apprehended

defendant at the gas station shortly thereafter. At that time, defendant was carrying

two cell phones, one of which belonged to T.H., and he claimed to be waiting for

someone to bring him money. After defendant was transported to the FVPD,

Detective Jeff Wenhart questioned him regarding T.H.’s allegations. Detective

Wenhart noticed scratches on defendant’s nose and cheek as well as fresh blood on

his shirt. A long, reddish head hair consistent with that of T.H. was found on

defendant’s face. During the videotaped interview, defendant acknowledged

spending time with T.H. and agreeing to purchase marijuana for her on the night in

 -4-
 STATE V. KNIGHT

 Opinion of the Court

question, but he denied having sex with her. He also explained that either his dog or

T.H.’s cat had scratched his face and that he had recently bit his tongue, which caused

the blood stain on his shirt.

 On 27 November 2012, defendant was indicted on one count each of second

degree forcible rape, second degree sexual offense, and first degree kidnapping. In a

separate indictment, defendant was also charged with assault on a female, common

law robbery, and interfering with an emergency communication.

 2013 Trial

 On 5 August 2013, defendant was tried in Wake County Criminal Superior

Court before the Honorable Reuben F. Young. During trial, defendant moved to

suppress his statement to Detective Wenhart. After viewing the videotape of

defendant’s interview and hearing arguments on the issue, Judge Young ruled that

the questions Detective Wenhart asked violated Miranda v. Arizona, 384 U.S. 436,

16 L. Ed. 2d 694 (1966), and ordered that defendant’s statement be suppressed. At

the close of all evidence, Judge Young dismissed the charges of common law robbery

and interfering with an emergency communication. On 8 August 2013, the jury found

defendant guilty of assault on a female, but was unable to reach a unanimous verdict

as to the kidnapping, rape, and sexual assault charges, prompting Judge Young to

declare a mistrial on those three charges.

 -5-
 STATE V. KNIGHT

 Opinion of the Court

 2014 Trial

 In February 2014, defendant was retried on the charges of second degree rape,

second degree sexual offense, and first degree kidnapping in Wake County Superior

Court before the Honorable Kendra D. Hill. During trial, the State revisited the issue

of Judge Young’s suppression ruling in the 2013 trial and argued that Judge Hill had

the authority to overrule it. Judge Hill felt the issue presented a “close question[,]”

but she eventually ruled that defendant’s statement to Detective Wenhart was

admissible. At the close of all evidence, defendant moved that the kidnapping charge

be dismissed, arguing that there was insufficient evidence of “a separate . . . act

independent and apart from the potential two underlying felonies” (second degree

rape and second degree sexual offense). Judge Hill denied the motion.

 Defendant testified in his own defense as to what happened at T.H’s home

during the evening of 12 October 2012. According to defendant, while he and T.H.

were sitting on the living room couch, T.H. leaned in and kissed him. At one point in

the evening, T.H. got up to use the bathroom and, upon her return, she was wearing

nothing but her sweater and underwear. T.H. asked defendant to “[c]ome here.” In

response, defendant resumed kissing T.H. before eventually moving her to the

bedroom. Once there, defendant fell backwards onto the bed with T.H. on top of him.

Eventually, defendant rolled T.H. over and got on top of her, but upon his doing so,

 -6-
 STATE V. KNIGHT

 Opinion of the Court

she “freaked out,” hit and “flicked” him in the face, began screaming, and ran out the

front door. Defendant denied having sex with T.H., and claimed that he neither

removed her clothes nor attempted to put his penis in her mouth.

 The jury found defendant guilty of second degree rape and first degree

kidnapping, but acquitted him on the second degree sexual offense charge. Judge

Hill then consolidated the two convictions, sentencing defendant to a minimum of 90

and a maximum of 168 months in the custody of the North Carolina Department of

Public Safety, Division of Adult Correction. Defendant appeals.

 II. Analysis

 A. Judge Young’s Ruling

 1. Law of the Case

 Defendant first argues that because Judge Young suppressed defendant’s

videotaped statement in the 2013 trial, Judge Hill was bound by that ruling in the

2014 trial. This argument is partially premised on the law of the case doctrine.

 According to the law of the case doctrine, “ ‘once an appellate court has ruled

on a question, that decision becomes the law of the case and governs the question

both in subsequent proceedings in a trial court and on subsequent appeal.’ ” State v.

Boyd, 148 N.C. App. 304, 308, 559 S.E.2d 1, 3 (2002) (quoting Weston v. Carolina

Medicorp, Inc., 113 N.C. App. 415, 417, 438 S.E.2d 751, 753 (1994)). From the outset,

 -7-
 STATE V. KNIGHT

 Opinion of the Court

we note that this legal principle does not apply here because there has been no prior

appeal in this case.

 Even so, another version of the doctrine, which is relevant here, provides that

“when a party fails to appeal from a tribunal’s decision that is not interlocutory, the

decision below becomes the law of the case and cannot be challenged in subsequent

proceedings in the same case.” Boje v. D.W.I.T., 195 N.C. App. 118, 122, 670 S.E.2d

910, 912 (2009) (internal quotation mark omitted).

 Defendant contends that once Judge Young ruled on defendant’s motion to

suppress, the State had the right to appeal pursuant to N.C. Gen. Stat. § 15A-979(c),

which provides that “[a]n order by the superior court granting a motion to suppress

prior to trial is appealable to the appellate division of the General Court of Justice

prior to trial. . . . ” According to defendant, by failing to appeal the ruling, “the State

waived its right to challenge [the] order and its waiver made Judge Young’s

suppression decision . . . binding in future proceedings.” Defendant also makes a

separate, but related, argument1 based on the rule “that one Superior Court judge

may not correct another's errors of law; and that ordinarily one judge may not modify,

overrule, or change the judgment of another Superior Court judge previously made

in the same action.” State v. Macon, 227 N.C. App. 152, 156, 741 S.E.2d 688, 690

 1 We note that defendant cites this rule in his discussion on res judicata and collateral estoppel,
but we find it more appropriate to discuss it in the context of the law of the case doctrine. The essence
of all defendant’s arguments on the suppression issue is that Judge Young’s ruling was absolutely
binding on Judge Hill.

 -8-
 STATE V. KNIGHT

 Opinion of the Court

(internal quotations and citations omitted), review denied, 367 N.C. 238, 748 S.E.2d

545 (2013). Both arguments are without merit.

 To begin, subsection 15A-979(c) applies only when a pretrial order granting a

motion to suppress has been entered. Notably, the comment to section 15A-979

provides that “[t]he phrase ‘prior to trial’ unquestionably will be interpreted to mean

prior to the attachment of jeopardy.” N.C. Gen. Stat. § 15A-979 cmt. 1 (2013).

Jeopardy attaches when “a competent jury has been empaneled and sworn.” State v.

Priddy, 115 N.C. App. 547, 550, 445 S.E.2d 610, 613 (1994). In the instant case,

because Judge Young’s suppression ruling was entered during defendant’s 2013 trial,

the State had no right to appeal it pursuant to subsection 15A-979(c). Consequently,

Judge Young’s ruling was not conclusive and did not become the law of the case in

future proceedings.

 Moreover, when a defendant is retried following a mistrial, prior evidentiary

rulings are not binding. State v. Harris, 198 N.C. App. 371, 376, 679 S.E.2d 464, 468

(2009). Indeed, once a mistrial has been declared, “in legal contemplation there has

been no trial.” State v. Sanders, 347 N.C. 587, 599, 496 S.E.2d 568, 576 (1998)

(quoting State v. Tyson, 138 N.C. 627, 629, 50 S.E. 456, 456 (1905)). “When a

defendant’s trial results in a hung jury and a new trial is ordered, the new trial is ‘[a]

trial de novo, unaffected by rulings made therein during the [original] trial.’ ” Harris,

198 N.C. App. at 376, 679 S.E.2d at 468 (quoting Burchette v. Lynch, 139 N.C. App.

 -9-
 STATE V. KNIGHT

 Opinion of the Court

756, 760, 535 S.E.2d 77, 80 (2000) (“[A] ‘mistrial results in nullification of a pending

jury trial.’ ” (citation omitted)).

 Here, when Judge Young declared a mistrial on the kidnapping, rape, and

sexual assault charges, his ruling on defendant’s motion to suppress “no longer had

[any] legal effect.” Id. at 376, 679 S.E.2d at 468. Indeed, the rule that one Superior

Court judge may not overrule another never came into play. Accordingly, Judge Hill’s

discretion was not limited at defendant’s retrial, and she was free to rule anew on his

motion to suppress.

 2. Res Judicata and Collateral Estoppel

 Defendant also argues the doctrines of res judicata and collateral estoppel

barred the State from re-litigating the suppression of his statement. Specifically

defendant contends that, since Judge Young made factual findings to support his

suppression ruling, and since the jury reached a verdict on one relevant issue, i.e.,

the assault on a female conviction, the admissibility of defendant’s statement was

conclusively determined at the 2013 trial. We disagree.

 First off, although defendant’s brief mentions res judicata in passing, he makes

no cognizable argument as to how the doctrine applies in this case. Therefore, this

argument has been abandoned. N.C.R. App. P. 28(b)(6) (“Issues not presented in a

party’s brief, or in support of which no reason or argument is stated, will be taken as

abandoned.”).

 - 10 -
 STATE V. KNIGHT

 Opinion of the Court

 We now turn to defendant’s collateral estoppel argument. “Under the doctrine

of collateral estoppel, an issue of ultimate fact, once determined by a valid and final

judgment, cannot again be litigated between the same parties in any future lawsuit.”

State v. Edwards, 310 N.C. 142, 145, 310 S.E.2d 610, 613 (1984).

 Judge Young appropriately made factual findings to support his ruling on

defendant’s motion to suppress. But that evidentiary ruling involved a question of

law based on largely undisputed facts; the admissibility of defendant’s statement

turned on whether he had knowingly and voluntarily waived his Miranda rights.

Indeed, no issues of “ultimate fact” were determined as to the kidnapping, rape, and

sexual assault charges because no “valid and final judgment” was entered on them.

“[T]he doctrine of collateral estoppel applies only to an issue of ultimate fact

determined by a final judgment.” Macon, 227 N.C. App. at 157, 741 S.E.2d at 691.

When Judge Young declared a mistrial on those charges, his ruling granting

defendant’s motion to suppress was vacated and had no enduring legal effect. Harris,

198 N.C. App. at 376, 679 S.E.2d at 468. Accordingly, Judge Hill was not bound by

any of Judge Young’s prior rulings and the doctrine of collateral estoppel is

inapplicable to this case.

 B. Judge Hill’s Suppression Ruling at Defendant’s 2014 Trial

 Defendant next argues the trial court erred in denying his motion to suppress

the statement he made to Detective Wenhart during a recorded interview at the

 - 11 -
 STATE V. KNIGHT

 Opinion of the Court

FVPD. We agree, but ultimately conclude that defendant was not prejudiced by the

error.

 According to the interview transcript, the following exchange occurred between

defendant and Detective Wenhart:

 [Det. Wenhart]: Okay. As officer (Inaudible) was getting
 ready to explain to you -- had mentioned to you, obviously,
 we’re investigating what has been alleged as a sexual
 offense crime. Okay?
 ...

 This is your opportunity, should you so desire, to put your
 side of the story --

 [defendant]: No -- I don’t --

 [Det. Wenhart]: -- You know, to tell your side of the story
 so that we can get to the bottom of what happened.

 [defendant]: Man, I don’t have no side --

 [Det. Wenhart]: So before -- before I ask you any questions
 you must understand your rights.

 You have the right to remain silent and not make any
 statement.

 [defendant]: So now, I’m under arrest?

 [Det. Wenhart]: Anything you -- well --

 [defendant]: I’m under arrest.

 [Det. Wenhart]: Okay.

 [defendant]: If you’re reading me my rights, I’m under
 arrest.

 - 12 -
 STATE V. KNIGHT

 Opinion of the Court

...

[Det. Wenhart]: [W]ell, first off, relax, because when we
read somebody their rights it doesn’t necessarily mean
they’re under arrest.
...

[Det. Wenhart]: You are in custody, hence the handcuffs.

[defendant]: Yeah. For what? For what? I --
...

Det. Wenhart: Right. Well, here’s the thing, is you are
detained, which means that you are in custody. It does not
necessarily mean arrest, it just means in custody. And the
reason you’re in custody is because you have been
identified, you do have some injuries that are consistent
with what’s went on --

[defendant]: What injuries?
...

[Det. Wenhart]: Okay. Well, you got some scratches. You
got some blood on you. You got some other -- so anyway.
So there is some allegations of that. So this is your
opportunity to tell your side of the story.
...

[defendant]: [W]hat the hell do you want me to say?
...

[Det. Wenhart]: [W]ell, we’ll get to that. But you got to let
me finish explaining what’s going on, okay?
...

[Det. Wenhart]: This is what I have to do. I have to advise
[you of] your rights. And then I’m gonna ask you some
questions.

[defendant]: Man, I --

 - 13 -
 STATE V. KNIGHT

 Opinion of the Court

 [Det. Wenhart]: Listen -- listen -- listen -- listen -- listen to
 me.

 [defendant]: I’m intoxicated. I’m -- I’m just --

 [Det. Wenhart]: Mr. Knight. Mr. Knight. Mr. Knight.

 [defendant]: Some bullshit, bro.
 ...

 [Det. Wenhart]: If I were taking one person at their word,
 would I need to sit here and talk to you and find out what–

 [defendant]: Why are you even talking to me?
 ...

 [Det. Wenhart]: Because I want your side of the story as to
 what happened tonight.
 ...

 [defendant]: I have no story to tell.
 ...

 [defendant]: See, that’s the thing right there I don’t
 understand. What the hell am I doing in these damn cuffs,
 man?

 [Det. Wenhart]: Well, if you want me to explain that, you
 got to allow me to get through here. Okay?
 ...

 [Det. Wenhart]: You must understand your rights.

At this point in the interrogation, Detective Wenhart Mirandized defendant. When

asked if he understood each of the rights that were explained to him, defendant went

on the following rant:

 - 14 -
 STATE V. KNIGHT

 Opinion of the Court

 [defendant]: I -- not really. I’m --

 [Det. Wenhart]: Well --

 [defendant]: I’m -- I’m not gonna lie to you, man. I’m -- I’m
 -- I’m -- I’m serious. See, this is where I’m at now.

 [Det. Wenhart]: Uh-huh?

 [defendant]: (Inaudible) I’m gonna be frank with you. This
 is exactly where I’m at. I haven’t did anything wrong, man.

 [Det. Wenhart]: Uh-huh.

 [defendant]: Not a damn thing. You see what you see. I
 don’t care. But I haven’t did any damn thing wrong. I
 haven’t harmed anybody, I haven’t did anything to
 anybody. . . .

 [Det. Wenhart]: Okay.

 [defendant]: Other than that right there, I don’t know what
 the hell you talking about.

Defendant then proceeded to answer Detective Wenhart’s questions regarding, inter

alia, the sexual assault under investigation, the scratches on defendant’s nose and

cheek, and the nature of his relationship with T.H. Throughout the interview,

defendant denied having any sexual contact with T.H., stating at one point, “Bro, it

never happened.”

 As noted above, both parties revisited issues regarding the interview’s

admissibility before the State called Detective Wenhart to testify at defendant’s

second trial. Consequently, Judge Hill conducted a voir dire hearing on defendant’s

 - 15 -
 STATE V. KNIGHT

 Opinion of the Court

motion to suppress the video. After considering the arguments of counsel and

reviewing the video, the trial court determined that the central issues of contention

were whether defendant understood his Miranda rights and whether his conduct

during the interview established an implied waiver of those rights. In regards to

those issues, the trial court made the following oral findings of fact:

 Defendant immediately said are you arresting me? At that
 time defendant was . . . handcuffed to the wall, was clearly
 detained, and yet the reading of the rights triggered in the
 defendant’s mind that this was an arrest, which to the
 Court provides some indication of [defendant’s knowledge
 about] Miranda. . . .

 Defendant has a prior [felony] criminal history . . ., so [he
 has] some knowledge and familiarity with the criminal
 justice system. . . . Clear language was used here. . . .
 [D]efendant’s statement was not equivocal in saying no, I
 do not, really in response to whether he understood his
 rights. . . . [T]he nature of the discussion prior to the full
 reading of the rights made it clear that . . . defendant was
 seeking information about what had happened here and
 wanted to provide information with regard to . . . what had
 been done here, indicating . . . defendant[’s willingness] to
 [talk] and actually [say] to [Detective Wenhart] I want to
 be frank with you, I want to explain this to you.

Judge Hill also found that defendant was an adult in his thirties with no indication

of cognitive problems. Based on these findings, Judge Hill concluded as a matter of

law that defendant “understood his [Miranda] rights” and that “through his

continued discussion [with law enforcement,]” he voluntarily and impliedly waived

those rights in providing a statement to Detective Wenhart.

 - 16 -
 STATE V. KNIGHT

 Opinion of the Court

 On appeal, defendant challenges the trial court’s legal conclusion that he

knowingly and impliedly waived his Miranda rights. The essence of this argument

is that Judge Hill’s findings do not support her conclusion that defendant understood

his rights.

 “Our review of a trial court’s denial of a motion to suppress is strictly limited

to determining whether the trial court’s underlying findings of fact are supported by

competent evidence, and whether those factual findings in turn support the trial

court’s ultimate conclusions of law.” State v. Robinson, 221 N.C. App. 509, 517-18,

729 S.E.2d 88, 96 (2012) (citation omitted). “[T]he trial court’s findings of fact after a

voir dire hearing concerning the admissibility of a [defendant’s custodial statement]

are conclusive and binding on [this Court] if supported by competent evidence.” State

v. Simpson, 314 N.C. 359, 368, 334 S.E.2d 53, 59 (1985) (citations omitted). However,

the trial court’s legal conclusion that defendant’s statement was knowingly,

intelligently, and voluntarily made is fully reviewable on appeal. Id.

 The Fifth Amendment to the United States Constitution protects a person from

being compelled to be a witness against himself in a criminal case. U.S. Const.

amend. V. This privilege against self-incrimination “is made applicable to the states

by the Fourteenth Amendment.” State v. Richardson, 226 N.C. App. 292, 299, 741

S.E.2d 434, 440 (2013). In Miranda, the United States Supreme Court decreed that

statements obtained from a suspect during custodial interrogation are presumed to

 - 17 -
 STATE V. KNIGHT

 Opinion of the Court

be compelled in violation of the Fifth Amendment’s Self-Incrimination Clause and are

thus inadmissible in the State’s case-in-chief. 384 U.S. 436, 457-58, 16 L.Ed.2d 694,

713-14 (1966). Under Miranda, “the prosecution may not use statements, whether

exculpatory or inculpatory, stemming from custodial interrogation of the defendant

unless it demonstrates the use of procedural safeguards effective to secure the

privilege against self-incrimination.” Id. at 444, 16 L. Ed. 2d at 706. These

safeguards include warning a criminal suspect being questioned that he “has the

right to remain silent, that anything he says can be used against him in a court of

law, [and] that he has the right to the presence of an attorney,” either retained or

appointed. Id. at 479, 16 L. Ed. 2d at 726.

 However, since Miranda’s main protection lies in advising defendants of their

rights[,]” Berghuis v. Thompkins, 560 U.S. 370, 385, 176 L. Ed. 2d 1098, 1113 (2010),

once its procedural safeguards are properly in place, a statement is not presumptively

compelled if the suspect voluntarily, knowingly, and intelligently waives his privilege

against self-incrimination. State v. Simpson, 314 N.C. 359, 367, 334 S.E.2d 53, 59

(1985); Miranda, 384 U.S. at 444, 16 L. Ed. 2d at 707. A valid waiver of Miranda

rights involves two distinct components: the waiver (1) must be given voluntarily and

(2) must be knowingly and intelligently made. Colorado v. Spring, 479 U.S. 564, 573,

93 L. Ed. 2d 954, 965 (1987). In assessing voluntariness, the issue is whether the

defendant’s statement “was the product of a free and deliberate choice rather than

 - 18 -
 STATE V. KNIGHT

 Opinion of the Court

intimidation, coercion, or deception.” Moran v. Burbine, 475 U.S. 412, 421, 89 L. Ed.

2d 410, 421 (1986). In assessing the knowing and intelligent requirements, “the

waiver must have been made with a full awareness of both the nature of the right

being abandoned and the consequences of the decision to abandon it.” Id. When a

suspect makes a statement after the required warnings have been given, the State

bears the burden of demonstrating by a preponderance of the evidence that the

suspect knowingly and intelligently waived his Fifth Amendment privilege. State v.

Thibodeaux, 341 N.C. 53, 58, 459 S.E.2d 501, 505 (1995). “Whether a waiver is

knowingly and intelligently made depends on the specific facts and circumstances of

each case, including the background, experience, and conduct of the accused.”

Simpson, 314 N.C. at 367, 334 S.E.2d at 59. “Only if the ‘totality of the circumstances

surrounding the interrogation’ reveal both an uncoerced choice and the requisite level

of comprehension may a court properly conclude that the Miranda rights have been

waived.” Moran, 475 U.S. at 421, 89 L. Ed. 2d at 421 (citations omitted) (italics

added).

 “To effectuate a waiver of one’s Miranda rights, a suspect need not utter any

particular words.” Burket v. Angelone, 208 F.3d 172, 198 (4th Cir. 2000) (citation

omitted). A waiver can be expressly made or implied, based on the words and actions

of the person interrogated. Berghuis, 560 U.S. at 384, 176 L. Ed. 2d at 1112 (“[A]

waiver of Miranda rights may be implied through “the defendant’s silence, coupled

 - 19 -
 STATE V. KNIGHT

 Opinion of the Court

with an understanding of his rights and a course of conduct indicating waiver.”

(citation omitted)).

 The voluntariness of the waiver is not at issue here. Instead, defendant argues

that the State’s failure to prove he understood his rights fatally undermined any

waiver he may have given.

 Some of the circumstances established by the evidence indicate that defendant

understood and properly waived his Miranda rights. At the time of questioning,

defendant was thirty-eight years old. There was nothing particularly unusual about

defendant’s behavior. He was alert. Defendant appeared to understand the questions

posed by Detective Wenhart, and as a general matter, he responded appropriately.

Even after stating he was “intoxicated,” defendant responded to questioning

coherently and logically. Despite aggressively contesting all charges against him,

defendant never appeared confused by the questions asked. Although defendant

specified that he did not understand “what the hell [he] was doing in these damn

cuffs,” that statement was apparently made to support his proclamation of innocence.

Throughout the interview, defendant was unintimidated and responsive; and he

never requested that the interview be stopped.

 Defendant had also been previously convicted of numerous misdemeanor

charges. In terms of defendant’s general awareness regarding the import of his

detention, he interrupted Detective Wenhart’s first attempt to Mirandize him,

 - 20 -
 STATE V. KNIGHT

 Opinion of the Court

stating, “If you’re reading my rights, I’m under arrest.” Detective Wenhart then

clearly explained to defendant that “when we read somebody their rights it doesn’t

mean they’re under arrest.” In most cases, these facts would support findings that

defendant understood his Miranda rights, and knowingly and intelligently waived

them. However, given the circumstances of this case, the aforementioned facts do not

suffice.

 Specifically, there is no persuasive evidence that defendant actually

understood his Miranda rights. Once a Miranda warning has been given and a

suspect makes an uncoerced statement, “[t]he prosecution must make the additional

showing that the accused understood these rights” in order to establish a valid

waiver. Berghuis, 560 U.S. at 384, 176 L. Ed. 2d at 1112. An understanding of rights

and an intention to waive them, therefore, are two entirely different matters, and the

former must be proven before the latter can be properly established.

 We recognize that “[p]rior experience with the criminal justice system is an

important factor in determining whether . . . defendant made a knowing and

intelligent waiver.” State v. Brown, 112 N.C. App. 390, 396-97, 436 S.E.2d 163, 167

(1993). However, while defendant had been arrested many times previously, there is

no direct evidence that he was Mirandized on those occasions. Even assuming

defendant received Miranda warnings during prior arrests, the record contains no

evidence that he demonstrated an understanding of his rights on previous occasions.

 - 21 -
 STATE V. KNIGHT

 Opinion of the Court

Prior experience with the criminal justice system is relevant, but it is not sufficient

to prove that defendant previously received Miranda warnings and understood them.

 In addition, the trial court’s findings that defendant had no cognitive

impairment and that Detective Wenhart issued the Miranda warnings using “clear

language” do not support its ruling. Just because defendant appeared to have no

mental disabilities does not mean he understood the warnings expressly mandated

by Miranda. As to the “clear language” finding, defendant argues “understanding

your Miranda rights requires not just knowing each right individually, but knowing

how the invocation of one right can impact your ability to exercise another right.” To

the extent defendant argues that suspects must have plenary knowledge of their

Miranda rights before waiving them, he is simply wrong. “The Constitution does not

require that a criminal suspect know and understand every possible consequence of

a waiver of the Fifth Amendment privilege.” Spring, 479 U.S. at 574, 93 L. Ed. 2d at

966. Even so, defendant correctly asserts that the State failed to prove he had a basic

understanding of the Miranda warnings, the principal purpose of which “is to ensure

that an accused is advised of and understands the right to remain silent and the right

to counsel.” Berghuis, 560 U.S. at 383, 176 L. Ed. 2d at 1112. We find no indication

that defendant understood he did not have to speak with Detective Wenhart, and that

he could request counsel.

 - 22 -
 STATE V. KNIGHT

 Opinion of the Court

 Finally, when asked if he understood his rights, defendant replied, “I -- not

really. I’m -- I’m not going to lie to you, man. I’m -- I’m -- I’m -- I’m serious. See this

is where I’m at now. I’m gonna be frank with you. This is exactly where I’m at. I

haven’t did anything wrong, man.” We agree with the trial court that defendant was

not indicating confusion as to his rights. Rather, taken in context, defendant’s

response showed that he was indignant about being hauled into the police station

because, in his view, he had not done anything wrong. Nonetheless, there is no

evidence that defendant ever acknowledged understanding his rights. Though

Detective Wenhart repeatedly stressed that defendant had to “understand [his]

rights,” defendant never made any kind of affirmative response to those admonitions.

In order for the State to prevail on the waiver issue, little was required to

demonstrate an acknowledgment of understanding. Defendants have used the

colloquialism “MmMumm,” Yang v. Cate, 2011 WL 3503211, at *13 (E.D. Cal.), and

even a nod of the head, People v. Crane, 145 Ill. 2d 520, 530, 585 N.E.2d 99, 103

(1991), to acknowledge their rights and give intelligent waivers. The Seventh Circuit

has held that a defendant’s “experience and eagerness to strike a deal” with law

enforcement after answering a few questions made it clear that he “understood his

rights and thought he might benefit from waiving them.” United States v. Brown,

664 F.3d 1115, 1118 (7th Cir. 2011). And in Burket, the Fourth Circuit held that a

defendant’s willingness “to speak with [law enforcement], coupled with his

 - 23 -
 STATE V. KNIGHT

 Opinion of the Court

acknowledgment that he understood his Miranda rights, constituted an implied

waiver of [those] rights.” 208 F.3d at 198 (emphasis added) (citing United States v.

Frankson, 83 F.3d 79, 82 (4th Cir. 1996)) (“[A] defendant’s subsequent willingness to

answer questions after acknowledging his Miranda rights is sufficient to constitute

an implied waiver.” (citation and internal quotation marks omitted)). As a

constitutional minimum, the State had to show that defendant intelligently

relinquished a known and understood right. Patterson v. Illinois, 487 U.S. 285, 292,

101 L. Ed. 2d 261, 272 (1988). Here, defendant exhibited a willingness to answer

questions after being Mirandized, but he never acknowledged his rights; nor did he

engage in behavior that demonstrated a true awareness of them. As such, there is no

persuasive evidence that defendant actually understood his right to remain silent and

right to counsel.

 All told, the “knowing and intelligent” waiver requirement implies that a

choice to abandon one’s rights must be based upon some appreciation of that

decision’s consequences. In other words, a factual understanding of the rights at

issue must come together with an appreciation of the relevance of those rights in the

context of an unfolding interrogation. The Constitution does not require that a

suspect understand the full import of custodial interrogation, but before a waiver of

rights can be intelligently made, one must understand both the basic privilege

guaranteed by the Fifth Amendment and the consequences of speaking freely to law

 - 24 -
 STATE V. KNIGHT

 Opinion of the Court

enforcement officials. In the instant case, the State presented sufficient evidence of

an implied waiver, but it did not show that defendant had a meaningful awareness

of his Miranda rights and the consequences of waiving them. Because the State failed

to make “the additional showing” by a preponderance of the evidence that defendant

understood his rights, we conclude that he did not waive them intelligently.

Berghuis, 560 U.S. at 384, 176 L. Ed. 2d at 1112. Accordingly, the trial court’s

findings do not support its ruling that defendant gave a valid waiver of rights and the

court erred by denying his motion to suppress the videotaped interview. Our decision

is not based on any particular disagreement with Judge Hill as to the facts found, but

on a differing legal evaluation of them.

 Because the trial court’s ruling infringed “upon . . . defendant’s constitutional

rights[, the error] is presumed to be prejudicial[.]” State v. Brown, 306 N.C. 151, 164,

293 S.E.2d 569, 578 (1982). Unless the State proves the trial court’s erroneous

admission of defendant’s custodial statement was harmless beyond a reasonable

doubt, he is entitled to a new trial. Id.; N.C. Gen. Stat. § 15A-1443(b) (2013). “The

test is whether, in the setting of this case, we can declare . . . that there is no

reasonable possibility the [erroneously admitted evidence] might have contributed to

the conviction.” State v. Castor, 285 N.C. 286, 292, 204 S.E.2d 848, 853 (1974). For

the following reasons, the State has met its burden.

 - 25 -
 STATE V. KNIGHT

 Opinion of the Court

 In the videotape shown to the jury, defendant never confessed to the crimes

for which he was tried. Rather, he adamantly proclaimed his innocence and

belligerently contested T.H.’s allegations. In State v. Council, the trial court’s

erroneous admission of the defendant’s custodial statements was found to be

harmless beyond a reasonable doubt when the only “comments [he] made which could

be viewed as even possibly inculpatory were: (1) wondering whether he ‘might do 5 to

7’ years in prison (presumably a reference to the possible consequences of his arrest),

(2) an admission that he had seen and narrowly avoided police officers the night

before, (3) an expression that he had intended to stay ‘on the run’ as long as possible,

and (4) a question about why police had described him as ‘armed and dangerous.’ ”

___ N.C. App. ___, ___, 753 S.E.2d 223, 231, review denied, 367 N.C. 505, 759 S.E.2d

101 (2014). Similarly here, our review of the video and transcript of defendant’s

statement reveals few, if any, comments that could be viewed as inculpatory. If the

defendant’s statement in Council—which included references to potential jail time

and staying “on the run”—was not particularly prejudicial, the same holds true for

defendant’s statement in this case.

 Moreover, there was overwhelming evidence of defendant’s guilt on the rape

charge. In addition to T.H.’s detailed testimony, the State presented evidence of prior

statements T.H. made to police officers and a sexual assault nurse examiner shortly

after the incident with defendant occurred. When he was arrested, defendant had

 - 26 -
 STATE V. KNIGHT

 Opinion of the Court

T.H.’s cell phone in his possession and he lied to law enforcement regarding the

reason he was at the gas station. Defendant had scratches on his nose and cheek,

fresh blood on his shirt, and a strand of hair consistent with the color of T.H.’s head

hair on his cheek. When officers entered T.H.’s home to investigate, they found her

bed covers in disarray, and her pants and panties were inside out on the bedroom

floor. Subsequent chemical testing revealed the presence of defendant’s DNA on

T.H.’s panties, bed sheet, and comforter. Significantly, while being detained in Wake

County jail, defendant made several phone calls to Leicht and another to Ryan Knight

(“Ryan”) in which he gave conflicting accounts about what happened with T.H.

Defendant told Leicht the charges against him were “bullsh**.” However, in his

conversation with Ryan, defendant stated that T.H was “fu**ing” with him all night;

he thought she was going to give him some “pu**y];]” and he was getting ready to put

his “d**k” in her when she decided to holler rape, prompting defendant to “let the

b**ch go.”

 Despite the foregoing evidence, defendant insists that because the jury at his

2013 trial did not view his videotaped statement and “hung on the kidnapping, rape,

and sexual offense charges[,]” he was prejudiced when the jury at his 2014 trial

viewed the videotape and subsequently convicted him of rape and kidnapping.

Defendant also contends that when the videotape was erroneously admitted at his

2014 trial, he was “all but forced” to testify, something he did not do at his 2013 trial.

 - 27 -
 STATE V. KNIGHT

 Opinion of the Court

We view this as pure speculation. Although defendant asserts that he had to take

the stand at his retrial to “clarify any unresolved factual issues created by the

videotape[,]” he fails to state what those factual issues were. Quite simply, defendant

had a choice to either testify in his own defense during his 2014 retrial or simply

refuse to do so. He chose the former.

 Nevertheless, the dissent agrees with defendant’s reasoning, and adds that

because defendant testified at his 2014 trial, the State was able to impeach him with

prior convictions, including an August 2013 conviction of assault on a female which

arose from the same incident with T.H. Defendant’s credibility, however, had already

been significantly impugned before the prior conviction evidence was presented.

Indeed, the State used defendant’s statement to Detective Wenhart to impeach

defendant’s trial testimony on several points. “A statement taken in violation of a

defendant’s Miranda rights may nonetheless be used to impeach the defendant’s

credibility if (1) the statement was not involuntary, and (2) the defendant testified at

trial.” State v. Purdie, 93 N.C. App. 269, 279, 377 S.E.2d 789, 795 (1989) (citing

Harris v. New York, 401 U.S. 222, 224, 28 L. Ed. 2d 1, 4 (1971)). Since the above

criteria were met in this case, the cross-examination questions of defendant regarding

his statement were proper. Id. at 279-80, 377 S.E.2d at 795; Harris, 401 U.S. at 225-

26, 28 L. Ed. 2d at 4-5; State v. Stokes, 357 N.C. 220, 226, 581 S.E.2d 51, 55 (2003).

 - 28 -
 STATE V. KNIGHT

 Opinion of the Court

Consequently, the State had already questioned and damaged defendant’s character

for truthfulness by the time it chose to utilize the prior conviction evidence.

 In sum, defendant essentially argues that “history repeats itself,” and he asks

us to assume that all other factors—the jury’s makeup, the effect of the testimony,

the lawyering, etc.—relevant to the outcome of his 2013 and 2014 trials were the

same except for the erroneous admission of his statement, which supposedly forced

him to testify the second time around. We reject this argument. Our Supreme Court

has noted that “[o]rdinarily, where a confession made by the defendant is erroneously

admitted into evidence, we cannot say beyond a reasonable doubt that the erroneous

admission of the confession did not materially affect the result of the trial to the

prejudice of the defendant.” State v. Siler, 292 N.C. 543, 552, 234 S.E.2d 733, 739

(1977). Here, there was no confession. Quite the opposite occurred. Since the

videotaped statement did not inculpate defendant on any charges, and the State

presented overwhelming evidence on the rape charge, we conclude, beyond a

reasonable doubt, that the outcome of defendant’s trial would have been the same

even if the videotape had been suppressed. See State v. Greene, 324 N.C. 1, 12, 376

S.E.2d 430, 438 (1989) (holding that, even assuming error, admission of the

defendant’s statement was harmless beyond a reasonable doubt because the

“statement d[id] nothing to inculpate [the] defendant and [was] not probative of his

 - 29 -
 STATE V. KNIGHT

 Opinion of the Court

guilt or innocence”), vacated on other grounds, 494 U.S. 1022, 108 L. Ed. 2d 603

(1990).

 C. Judge Hill’s Denial of Defendant’s Motion to Dismiss the First

 Degree Kidnapping Charge

 Finally, defendant argues the trial court erred by denying his motion to dismiss

the first degree kidnapping charge because there was insufficient evidence that the

confinement and restraint of T.H. was separate and apart from the rape. In making

this argument, defendant insists that, “because the indictment alleged that [he]

confined and restrained T.H. for the purpose of facilitating the forcible rape, the State

. . . had to prove both confinement and restraint” to support the kidnapping charge.

Once again, we disagree.

 As an initial matter, we note that defendant incorrectly asserts the State bore

the burden of proving both confinement and restraint to support the kidnapping

charge. Kidnapping is a specific intent crime, and the State had to prove that

defendant unlawfully restrained, confined, or removed T.H. “for one of the specified

purposes outlined in the statute.” State v. Moore, 315 N.C. 738, 743, 340 S.E.2d 401,

404 (1986). “Since an indictment need only allege one statutory theory, an indictment

alleging all three theories is sufficient and puts the defendant on notice that the State

intends to show that the defendant committed kidnapping in any one of the three

theories.” State v. Lancaster, 137 N.C. App. 37, 48, 527 S.E.2d 61, 69 (2000). Here,

 - 30 -
 STATE V. KNIGHT

 Opinion of the Court

the indictment alleged that defendant restrained and confined T.H. to facilitate the

commission of a felony, forcible rape. As a result, either one of those theories—

restraint or confinement—could serve as the basis for the jury’s finding on the

kidnapping charge.

 In terms of ruling on a motion to dismiss for insufficiency of the evidence, our

Supreme Court

 has held that . . . the trial court must consider the evidence
 in the light most favorable to the State and give the State
 every reasonable inference to be drawn therefrom. The
 State is required to present substantial evidence for each
 element of the offense charged. The trial court must
 consider all evidence presented that is favorable to the
 State. If there is substantial evidence, either direct or
 circumstantial, that the defendant committed the offense
 charged, then a motion to dismiss is properly denied.

State v. Gainey, 355 N.C. 73, 89, 558 S.E.2d 463, 474 (2002) (citations omitted).

“Substantial evidence is relevant evidence that a reasonable mind might accept as

adequate to support a conclusion.” State v. Vick, 341 N.C. 569, 583-84, 461 S.E.2d

655, 663 (1995).

 Any person “who, without consent, unlawfully confines, restrains, or removes

someone sixteen years of age or older shall be guilty of kidnapping when it is done for

the purpose of facilitating commission of a felony.” State v. Parker, ____ N.C. App.

____, 768 S.E.2d 1, 2 (2014); N.C. Gen. Stat. § 14-39(a)(2) (2013). Kidnapping becomes

a first degree offense when a kidnapping victim is sexually assaulted. N.C. Gen. Stat.

 - 31 -
 STATE V. KNIGHT

 Opinion of the Court

§ 14–39(b) (2013). As used in subsection 14-39(a), the term “confine” means “some

form of imprisonment within a given area, such as a room, a house or a vehicle.” State

v. Fulcher, 294 N.C. 503, 523, 243 S.E.2d 338, 351 (1978). The term “restraint”

includes confinement, but also means “restriction, by force, threat or fraud, without

a confinement. Thus, one who is physically seized and held . . . or who, by the

threatened use of a deadly weapon, is restricted in his freedom of motion, is restrained

within the meaning of this statute.” Id.

 However, “[i]t is self-evident that certain felonies (e.g., forcible rape and armed

robbery) cannot be committed without some restraint of the victim.” Id. To support

a conviction on charges of both rape and kidnapping, “the restraint [or confinement],

which constitutes the kidnapping, [must be] a separate, complete act, independent of

and apart from the other felony.” Id. at 524, 243 S.E.2d at 352. “[A] person cannot

be convicted of kidnapping when the only evidence of restraint [or confinement] is

that ‘which is an inherent, inevitable feature’ of another felony such as [rape].” State

v. Beatty, 347 N.C. 555, 559, 495 S.E.2d 367, 369 (1998) (quoting Fulcher, 294 N.C.

at 523, 243 S.E.2d at 351).

 In determining whether the restraint in a particular case is sufficient to

support a kidnapping charge,

 [t]he court may consider whether the defendant’s acts place
 the victim in greater danger than is inherent in the other
 offense, or subject the victim to the kind of danger and
 abuse that the kidnapping statute was designed to prevent.

 - 32 -
 STATE V. KNIGHT

 Opinion of the Court

 The court also considers whether defendant's acts “cause
 additional restraint of the victim or increase the victim's
 helplessness and vulnerability.”

State v. Key, 180 N.C. App. 286, 290, 636 S.E.2d 816, 820 (2006) (citations omitted).

 Here, “the commission of the underlying felony of rape did not require

[defendant] to separately restrain or remove” T.H. from her living room couch to her

bedroom. Key, 180 N.C. App. at 291, 636 S.E.2d at 821. T.H. demonstrated

defendant’s size relative to her own by describing him as “a body builder.” In addition,

when defendant abruptly picked T.H. up off of her couch, he immobilized her arms

and lifted her feet off the ground. By way of this restraint, defendant gained full

control of T.H. in her living room and could have raped her there, but instead, he

chose to carry T.H. through her home and commit the rape in her bedroom. See State

v. Blizzard, 169 N.C. App. 285, 290, 610 S.E.2d 245, 250 (2005) (“Asportation of a

rape victim is sufficient to support a charge of kidnapping if the defendant could have

perpetrated the offense when he first threatened the victim, and instead, took the

victim to a more secluded area to prevent others from witnessing or hindering the

rape.”). Such movement and restraint constituted “a separate and independent act”

not inherent to the rape in this case. Key, 180 N.C. App. at 291, 636 S.E.2d at 821.

 When defendant removed T.H. from her living room to her bedroom, he also

“increase[d her] helplessness and vulnerability.” Id. at 290, 636 S.E.2d at 820.

Specifically, when defendant was carrying T.H. through the kitchen, she began

 - 33 -
 STATE V. KNIGHT

 Opinion of the Court

screaming, well-aware that both the front and back doors to her home were open.

Once in the bedroom, T.H.’s chance of successfully attracting the attention and help

of neighbors was significantly decreased. When viewed in the light most favorable to

the State, the evidence was sufficient to establish that defendant, by physically

seizing and restraining T.H. before carrying her away from open exterior doors and

into the bedroom, facilitated his ability to commit the rape and “exposed [T.H.] to a

greater degree of danger than that which is inherent in [rape].” State v. Ripley, 360

N.C. 333, 340, 626 S.E.2d 289, 294 (2006). Accordingly, the trial court properly denied

defendant’s motion to dismiss the kidnapping charge.

 III. Conclusion

 When Judge Young declared a mistrial on the charges of kidnapping, rape, and

sexual assault at defendant’s 2013 trial, his suppression ruling had no binding legal

effect. Neither the doctrine of collateral estoppel nor the rule that one Superior Court

judge cannot overrule another applied to this ruling. As such, Judge Hill was free to

rule anew on the suppression issue. Moreover, while the admission of defendant’s

videotaped statement at his 2014 trial was in violation of Miranda, the trial court’s

error did not prejudice defendant as it was harmless beyond a reasonable doubt.

Finally, there was sufficient evidence to support defendant’s conviction for first

degree kidnapping.

 - 34 -
 STATE V. KNIGHT

 Opinion of the Court

NO PREJUDICIAL ERROR.

Judge TYSON concurs.

Judge STROUD concurs in part and dissents in part.

 -2-
 No. COA14-1015 – State v. Knight

 STROUD, Judge, concurring in part and dissenting in part.

 I concur with the majority opinion on the first, second, and fourth issues

addressed but dissent based upon the third issue. Because I believe that the State

has failed to demonstrate that the erroneous admission of defendant’s videotaped

statement was harmless beyond a reasonable doubt, I would grant defendant a new

trial.

 The majority found that the trial court erred in denying defendant’s motion to

suppress, and I agree. Yet the majority finds that this error was harmless beyond a

reasonable doubt based upon the fact that in the videotaped statement, defendant did

not “confess” to the crime and in light of the other evidence, including physical

evidence, of defendant’s guilt.

 To find harmless error beyond a reasonable doubt,
 we must be convinced that there is no reasonable
 possibility that the admission of this evidence might have
 contributed to the conviction. In deciding whether a
 reasonable possibility exists that testimony regarding a
 defendant’s request for counsel contributed to his
 conviction, the lynchpin in our analysis is whether other
 overwhelming evidence of guilt was presented against
 defendant.

State v. Rashidi, 172 N.C. App. 628, 639, 617 S.E.2d 68, 76 (citations and quotation

marks omitted), aff’d per curiam, 360 N.C. 166, 622 S.E.2d 493 (2005).

 I agree that the evidence against defendant is strong, but I am not convinced

that the State has demonstrated that the error was harmless beyond a reasonable

doubt. The first jury considered the same physical evidence, the same witnesses, and
 STATE V. KNIGHT

 STROUD, J., concurring in part and dissenting in part

the same jail phone conversations as the second jury but was unable to reach a verdict

on any charge other than the assault on a female charge, so they did have doubt as

to the other charges. The second jury considered the same evidence but also

considered the erroneously admitted videotape and defendant’s own testimony.

Defendant argues that he did not testify at the first trial, but was “all but forced” to

testify at the second trial “to clarify any unresolved factual issues created by the

videotape.” The majority views the effect of the erroneous admission of the

videotaped interview on defendant’s decision to testify as “pure speculation[,]” but

given the first jury’s inability to reach a verdict on the relevant charges, I disagree. I

also note that even the second jury did not convict defendant of all of the charges

against him, as they found him not guilty of the second-degree sexual offense, despite

the “overwhelming” evidence as to all of the charges. And because defendant testified

in the second trial, the State was able to impeach him with evidence of his prior

convictions. Only the second jury learned of these convictions, and although the jury

was instructed to consider them only as to defendant’s credibility, these convictions

had the potential to be particularly prejudicial. One of the prior convictions was

defendant’s 8 August 2013 conviction of assault on a female, which arose from the

same incident with T.H., since this was the one charge upon which the first jury was

able to reach a verdict. The second jury also learned that he had been convicted of

assault on a female on 30 June 2004 and driving while impaired on 3 June 2005.

 2
 STATE V. KNIGHT

 STROUD, J., concurring in part and dissenting in part

 The majority notes that at the second trial, defendant’s credibility had already

been “significantly impugned” even before the jury heard evidence of his prior

convictions, referring to his cross-examination regarding inconsistencies between

what he told Detective Wenhart and his trial testimony. To me, this argument seems

circular. Defendant would not have been testifying at all but for the erroneous

admission of the evidence, and he would not have been subject to cross-examination

upon the statement taken in violation of his Miranda rights if he had not testified. I

also disagree that this cross-examination “significantly impugned” defendant, since

the questioning simply pointed out minor variations between what defendant told

Detective Wenhart and what defendant said in court. Defendant also testified that

he was intoxicated when he was talking to the detective. In fact, defendant’s

apparent confusion and lack of demonstrated understanding of his Miranda rights—

perhaps arising at least in part from his intoxication—at this interview are part of

the reason that the majority holds that defendant did not understand or intelligently

waive his Miranda rights. Holding that the use of defendant’s statement, which

should have been suppressed, was not harmless beyond a reasonable doubt, and then

relying upon the very same evidence to demonstrate that defendant had already been

impeached, so that more impeaching evidence would not further harm him, seems

logically inconsistent to me. This impeachment came from the very statement to

Detective Wenhart that defendant had sought unsuccessfully before the trial court to

 3
 STATE V. KNIGHT

 STROUD, J., concurring in part and dissenting in part

suppress—and the majority here has held should have been suppressed—and which

was the reason that defendant believed that he must testify in the second trial. In

other words, but for the erroneous admission of the statement evidence, none of the

impeaching evidence, neither the cross-examination upon defendant’s erroneously

admitted statement nor the prior convictions, would have been considered by the

second jury. In this situation, I am simply not “convinced” that “there is no

reasonable possibility that the admission of this evidence might have contributed to

the conviction[s].” See id., 617 S.E.2d at 76. I therefore concur in part and dissent in

part, and would grant defendant a new trial.

 4